Williams Appeal.
Jones Appeal.

Argued March 27, 1967.  Before ERVIN, P. J.,
WRIGHT, WATKINS, MONTGOMERY, JACOBS, and SPAUL-
DING, JJ.  (HOFFMAN, J., absent).

Before MONTE-
MURO, JR., J.

*Vincent J. Ziccardi,* Assistant Defender, with him *Melvin Dildine,* Assistant Defender, and *Herman I. Pollock,* Defender, for appellants.

*Alan J. Davis,* Assistant District Attorney, with him *Edwin D. Wolf,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for appellee.

OPINION BY WATKINS, J., September 15, 1967:

This opinion is written to determine two appeals which were taken by John Williams and Ardry Jones from separate orders of the County Court of Philadelphia, committing appellants as defective delinquent juveniles to the State Correctional Institution at Dallas. Both appeals were argued together and raise the same issues and shall be disposed of by this one opinion.

The resume of the record of the two boys and the proceedings in these matters from the opinion of the court below clearly sets forth the facts as follows:

"John Williams was born November 23, 1950. His first contact with this Court was on June 11, 1956. The Pennsylvania Society to Protect Children From Cruelty filed a dependency petition on that date. It charged that John, together with his younger sister and brothers, were neglected; that their mother was an alcoholic and indifferent to the welfare of her children. John was returned to his mother on probation on November 19, 1957. Subsequently he was placed in the custody of foster parents, and of the Catholic Children's Bureau. He continued to be a problem and was finally excused from attendance at school because of his behavior problems.

"On August 30, 1960, Judge BROWN ordered him committed to a suitable State institution. On June 8, 1962, he was arrested on a charge of larceny, receiving stolen goods and incorrigibility. He was adjudged a delinquent by Judge HOFFMAN on June 15, 1962 and he was committed to the Youth Study Center pending acceptance by Pennhurst. He continued to present a behavioral problem and could not be handled by the Youth Study Center. He was accepted by St. Gabriel's Hall, Phoenixville, on November 14, 1962. On January 14, 1963, St. Gabriel's urgently requested his removal because he was emotionally disturbed and uncontrollable.

"On February 8, 1963, Judge HOFFMAN again ordered him committed to a suitable State Institution and on April 11, 1963 he was admitted to Pennhurst.

"On April 7, 1966 the Superintendent of Pennhurst requested that he be removed from Pennhurst. In support of this request, a total of 56 instances of misconduct were cited. These ranged from simple disciplinary violations to aggravated assault and battery and larceny. A delinquency petition was filed based on these charges.

"At the hearing on June 16, 1966, Dr. James C. Hirst, Chief Psychologist at Pennhurst, testified that continued custody at Pennhurst would aggravate the problems of the juvenile, who was completely uncooperative and who had a record of many serious infractions.

"Mrs. Anne Boyle, a registered nurse, testified that she was familiar with the infractions appearing in the report which was read into evidence. She identified the individuals who made the reports.

"A report by Dr. M. H. Robinson, a neuropsychiatrist who examined John Williams on July 12, 1962, was read into the record, as was a psychological report

on July 7, 1962 by Joseph F. O'Connor, psychologist for the County Court.

"There was also a psychiatric report by Dr. Salvatore Lombardi, which states that the boy's judgment, reasoning, discrimination and comprehension are all grossly impaired. He functions intellectually at a mental defective level.

"Martin H. Robinson, M.D., a qualified neuropsychiatrist, testified that he examined John on July 12, 1962 and May 12, 1966. The boy is obviously defective mentally. He has poor social sense, poor self-control and has hostile and aggressive impulses. He has need of long term custodial care in the hope that some semblance of control will develop. He is of the type classified as 'mental defective moderate.' This classification applies to individuals with an I.Q. between 50 and 70.

"Dr. James E. Stickler, a clinical psychologist, testified that he examined Williams on May 10, 1966 and found him to be moderately defective within the I.Q. range of 50 to 60. He is destructive, aggressive and explosive.

"At the hearing held on September 19, 1966, Enos Keller, Charge Attendant at Pennhurst, testified that on several occasions he caught Williams in the act of committing sodomy with another patient. One occasion occurred on November 23, 1964 with one Joseph Paulson and another occasion on December 10, 1964 with one Ben Lupton.

"Kathryn S. Moyer, education director, testified that on several occasions in 1965 Williams invaded the girls' building and grabbed and kissed a girl patient. He used obscene language to the girls and, on a number of occasions, exposed himself.

"Albert W. Knipe, Jr., an attendant, testified that, on one occasion, he saw Williams hit another patient in the eye, without any provocation. This assault inflicted serious injury, hospitalizing the patient for several weeks."

"Ardry Jones was born January 30, 1949. His first contact with the juvenile court came in 1956 as a result of behavioral problems in school. A dependency petition was filed by the Division of Pupil Personnel and Counselling on July 14, 1960. On January 24, 1961 he was ordered committed to a suitable State institution. On November 27, 1962, he was arrested and charged with indecent exposure in a public park. On January 30, 1963 this charge was dismissed by Judge HOFFMAN, but he was ordered held at the Youth Study Center pending acceptance by Pennhurst.

"He was admitted to Pennhurst on April 11, 1963. The petition of the Superintendent for his discharge from Pennhurst is supported by a recital of 40 disciplinary violations, including repeated assaults and acts of larceny.

"At the hearing on June 16, 1966, a report of R. D. Donovan, M. D., a neuropsychiatrist, was read into evidence. His examination was made on February 4, 1963. His diagnosis was mental deficiency, moderate, and he recommended commitment as soon as possible, because the boy constituted a danger to the community. A psychological report by Joseph F. O'Connor was made on February 2, 1963. This report states that the boy should be placed in an institution for his own protection and for the welfare of society.

"Reports of earlier examinations by Dr. Samuel Leopold, a neuropsychiatrist and I. Hyatt, a psychologist, also contain findings of mental deficiency. Dr. Leopold's report states that his explosive, aggressive behavior requires institutional care and training.

"Mrs. Anne Boyle identified the record and read into evidence the infractions committed by Jones at Pennhurst.

"Frederick W. Wouters, M.D., a qualified neuropsychiatrist, testified that Jones has established a pattern of handling stress by aggression. His diagnosis is that

the boy is a defective delinquent who is potentially dangerous.

"Carol Andrews, a psychologist, testified that she examined Jones on May 11, 1966. His I.Q. is 67. His reasoning is poor and he functions intellectually at the moderate defective range. He is indifferent to his environment, emotionally impulsive and aggressive. He is a menace to society.

"At the hearing held on September 19, 1966, Enos Keller testified that he saw Jones commit unprovoked assaults on patients on a number of occasions. On several occasions he deliberately destroyed property. He abuses and torments low grade patients. . He frequently exposed himself and attempted to. force other patients to commit sodomy. He has made sexual advances to other patients and attendants. On one occasion he punched another boy who resisted his advances.

"Albert W. Knipe testified that Jones habitually exposed himself and solicited other patients to commit sodomy. He saw him force his penis in another boy's mouth and, on one occasion, Jones made sexual advances to him."

The court below, after complete separate hearings at all critical stages of which both boys were represented by counsel and care was taken to protect their every right, adjudged them defective delinquents and ordered their confinement at Dallas.

Appellants argue that the court below was without power to order the confinement of these two boys at Dallas because the legislature designated the authority to transfer to and from Dallas be placed with the Department of Justice.

This contention is without merit for two reasons, one is that the Act of 1953, July 29, P. L. 1440, §3, 61 PS §542.3, places the administrative authority of the institutions under control of the Department of Justice in the Deputy Commissioner for Treatment of the Bu-

reau of Correction, and has not taken any power of sentencing and commitment from the courts. The determination of the question of whether one is mentally defective and has criminal tendencies and as to where he should be committed is vested in the courts under the Act of 1937, May 25, P. L. 808, §3, 61 PS §541-3, as amended.

Also, although these proceedings began by a petition for discharge of the boys from Pennhurst, it culminated in an original proceeding as to acts committed while the boys were in custody, a determination of delinquency, that they were mentally defective with criminal tendencies and a commitment as a result of these findings. This was not a transfer but an original act.

The boys were committed because of acts, which were crimes, done while in custody. The fact they were done while in custody does not change their nature nor the power of the court under whose jurisdiction they continue to rest.

The contention of appellants that the statute providing for commitments to Dallas is unconstitutional under the equal protection clause of the Fourteenth Amendment to the United States Constitution, in that it creates an unreasonable classification between male and female juveniles who are mentally defective with criminal tendencies is without merit.

What this Court said in the case of *Com. v. Daniels,* 210 Pa. Superior Ct. 156, 232 A. 2d 247 (1967), in attacking the Muncy Act on the same ground is equally applicable here. We said:

"In asking this court to declare a part of the Muncy Act unconstitutional, appellant has assumed a very heavy burden of proof. There is a strong presumption in favor of the constitutionality of acts of the legislature, e.g., New York v. O'Neill, 359 U.S. 1, 79 S. Ct. 564, 3 L. ed. 2d 585 (1959); Loomis v. Philadelphia

School District Board, 376 Pa. 428, 103 A. 2d 769 (1954), and this court will not declare an act of the legislature to be unconstitutional unless it is shown to be 'clearly, palpably and plainly' in violation of the constitution. Milk Control Commission v. Battista, 413 Pa. 652, 659, 198 A. 2d 840 (1964); Daly v. Hemphill, 411 Pa. 263, 271, 191 A. 2d 835, 840 (1963); Greenville Borough v. Guerrini, 208 Pa. Superior Ct. 42, 46, 220 A. 2d 366 (1966).

"The legislature in enacting the Muncy Act has decided that women as a class are to be treated differently than men as to the term and manner of incarceration for crimes. The fact that legislation might impose greater burdens on one class of citizens does not in itself violate the Equal Protection Clause. As was said by the Supreme Court in Rinaldi v. Yeager, 384 U.S. 305, 86 S. Ct. 1497, 16 L. ed. 2d 577, 580 (1966), that clause 'imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. "The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same . . ." Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends.' In a recent case the Supreme Court of this state held that imposing the added burden of oral exams on women candidates for police sergeant did not violate the Equal Protection Clause. Wells v. Civil Service Commission, 423 Pa. 602, 225 A. 2d 524 (1967). A classification by the legislature would violate the Equal Protection Clause only if it did not rest upon a difference between the classes that bore a reasonable relation to the purposes of the legislation. E.g., McLaughlin v. Florida, 379 U.S. 184, 85 S. Ct. 283, 13 L. ed. 2d 222 (1964); Hoyt v. Florida, 368 U.S. 57, 82 S. Ct. 159, 7 L. ed. 2d 118 (1961); Milk Control Com-

mission v. Battista, supra. The test stated by our Supreme Court is that a classification violates the Equal Protection Clause if it is shown to be patently arbitrary or utterly lacking in rational justification. Milk Control Commission v. Battista, supra. Of course, where fundamental rights and personal liberties may be affected by a classification, as they are here, the classification must be closely scrutinized and carefully confined. Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S. Ct. 1079, 16 L. ed. 2d 169, 174 (1966).[3]

"Is there a rational basis for the classification, i.e., a reasonable connection between the classification by sex and the purposes of the legislation? The broad purpose of the legislation was to provide for the punishment and rehabilitation of prisoners. Different types of incarceration for the same crimes are regularly imposed both for classes of individuals (e.g., juveniles,[4] sex offenders, recidivists, criminally insane),

---

"[3] In certain cases where a classification results in restricting personal liberties such as freedom of speech or which involve a racial classification, the classification is especially suspect and the state in the first instance must show a subordinating interest that is compelling. Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L. ed. 2d 510 (1965); McLaughlin v. Florida, supra; Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247, 5 L. ed. 2d 231 (1960); Bates v. Little Rock, 361 U.S. 516, 80 S. Ct. 412, 4 L. ed. 2d 480 (1960). But in those cases, except ones involving racial discrimination, it is not the classification that is in question, but it is the necessity of the law itself that must be justified once it is shown that it invades the fundamental rights of certain groups. Unlike those cases, here there can be no question of the necessity of the punishment and rehabilitation of those convicted of crime, nor is there any question that a punitive statute is the type that does justifiably subordinate certain fundamental rights of those convicted."

"[4] See Commonwealth ex rel. Clawges v. Claudy, 173 Pa. Superior Ct. 410, 98 A. 2d 225 (1953), where this court held that the act providing for sentence of juvenile offenders to the Pennsyl-

as well as among separate individuals where judicial discretion in imposing sentence may be allowed by the legislature. The only requirement for different treatment for different classes of persons is that the class exhibits characteristics that justify the different treatment. As was said by the Oregon Supreme Court in upholding a statute applying different treatment for sex offenders: 'It is the province of the legislature to establish the penalties for the violation of the various criminal statutes and if the penalties are founded upon an arguably rational basis we have no authority to hold that they are invalid.' Jensen v. Gladden, 231 Ore. 141, 372 P. 2d 183, 185 (1962)."

The creation of this institution is an advantage to a male and not a violation of a right. It is a problem for the legislature which may at some future time grant to females the advantage of such an institution.

Appellants' contention that the act providing for commitments to Dallas is void for vagueness because it does not define the term "mentally defective" and because men of common intelligence differ as to the meaning of the term is unfounded.

When the Act of 1937, May 25, P. L. 808, 61 PS §541.3, was first adopted and in 1947 when it was amended, it limited its application to a part of a well recognized class of people. It specifically referred to those who were mentally defective, a distinction established by definition in the Mental Health Act of 1923, July 11, P. L. 998, to which we must naturally refer since it deals with this exact problem, whereas the Dallas Act merely establishes the institution for care and confinement, admissions to it and its administration.

A term having a well known legal meaning need not be specifically defined each time it is used in a

vania Industrial School at Camp Hill was not a denial of equal protection or due process."

statute which clearly adopts the term from a prior statute in which the term is clearly defined.

The fact that commitment to Dallas is limited to a part of the class of mental defectives is of no consequence since those barred from admission are clearly set forth. Nor is the fact that a psychologist and a psychiatrist or even two physicians use slightly different criteria to arrive at the same conclusion a basis to declare the act unconstitutional.

It was clearly the intent of the legislature to have explored all bases and criteria for a finding that one is a mental defective with criminal tendencies when the act provided as follows:

"§541-3. When any male person over the age of fifteen years is convicted of crime before any court, or is held as a juvenile delinquent by any juvenile court, or is detained in any prison, industrial school, workhouse, house of correction, penitentiary or any other penal or correctional institution under sentence, and such person is, in the opinion of the court or the superintendent, jail physician, or warden of the institution where maintained, so mentally defective that he should be cared for and maintained in the Pennsylvania Institution for Defective Delinquents, such superintendent, physician or warden shall make application, upon a form prepared by the Department of Welfare, to the court having jurisdiction of the charge against such person, which court, upon the presentation of such petition, or upon its own motion in case of convictions before it or juvenile delinquents appearing before it, or upon application of the district attorney, the defendant or counsel for the defendant, or other person acting for the defendant, shall order an inquiry by a psychiatrist and a psychologist or by two qualified physicians as now provided by law, who shall immediately examine the said person and make written report of its findings to the court. If, in the opinion of the

psychiatrist and psychologist or the physicians, the person so committed or convicted or held is mentally defective and has criminal tendencies, whether or not coupled with mental instability, he or they shall so state in the report of their examination to the court. The court may, in its discretion, summon other witnesses and secure further evidence. If the court is then satisfied that the person thought to be mentally defective is not insane, nor can be classified as an idiot or imbecile by recognized psychological tests nor a psychopath or an infirmary case, though in fact mentally defective with criminal tendencies, the court shall order the commitment or transfer of such person to the Pennsylvania Institution for Defective Delinquents. . ."

Orders affirmed.