Commonwealth *v.* Williams, Appellant.
Commonwealth *v.* Jones, Appellant.

Argued April 16, 1968. Before Bell, C. J., Mus-manno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*Vincent J. Ziccardi,* First Assistant Defender, with him *Elizabeth Langford Green* and *Melvin Dildine,* Assistant Defenders, and *Herman I. Pollock,* Defender, for appellants.

*Alan J. Davis,* Assistant District Attorney, with him *Michael J. Rotko* and *Roger F. Cox,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for appellee.

Opinion by Mr. Justice Roberts, October 3, 1968:
Appellants John Williams and Ardry Jones are presently incarcerated in the State Correctional Institution at Dallas, having been adjudged defective delinquents with criminal tendencies by the Juvenile

Court of the County of Philadelphia. The Superior Court affirmed both commitments, *Williams Appeal, Jones Appeal,* 210 Pa. Superior Ct. 388, 234 A. 2d 37 (1967), and this Court granted allocatur.

Appellants' arguments before this Court break down into three categories: (1) an attack upon the expert medical testimony introduced before the juvenile court; (2) an attack upon the constitutionality of the Dallas Act under which Jones and Williams were committed. Act of May 25, 1937, P. L. 808, §3, as amended, 61 P.S. §541-3;[1] and (3) an attack upon the type of treatment afforded persons confined to Dallas. We shall treat these arguments seriatim.

## Expert Medical Testimony

In order to evaluate properly the testimony introduced below upon which appellants were found both delinquent and mentally defective, it is first necessary to review in some detail the personal history of Williams and Jones.

John Williams was born in 1950. At the age of six he was placed with foster parents, began school, and became such a behavior problem that he was finally excused from further attendance. In 1962, at the age of twelve, Williams was arrested on charges of larceny, receiving stolen goods and incorrigibility. Shortly thereafter he was adjudged delinquent by the juvenile court and given a series of psychiatric and psychological tests, the results of which were unanimous

---

[1] On July 20, 1968 the Dallas Act was repealed by Act No. 206 (Senate Bill 1225). Although the effect of this repealer is that no more commitments to Dallas may be made, unlike a retroactive declaration by this Court that a statute is unconstitutional the mere repeal of the Dallas Act will not operate to void all prior commitments. Thus, appellants' constitutional arguments must still be faced.

in diagnosing Williams as mentally defective.[2] Accordingly, he was ordered held at the Youth Study Center pending acceptance by Pennhurst (a Commonwealth operated hospital-school for mental defectives). While awaiting acceptance by Pennhurst, however, Williams was accepted by St. Gabriel's Hall, a private institution operated by the Catholic Children's Bureau. Less than two months after arriving at St. Gabriel's the school urgently requested his removal because he was emotionally disturbed and uncontrollable. As a result, Williams was again sent to the Youth Study Center, eventually proceeding from there to Pennhurst in April, 1963.

During the next three years Williams embarked upon a campaign of misconduct ranging from the simple teasing of low-grade patients to such crimes as larceny, assault and battery, and sodomy. A total of 56 instances of misconduct were reported by the Pennhurst authorities who, in April, 1966, petitioned the Juvenile Court for Williams' removal. Two hearings were held thereafter by the Juvenile Court. The first hearing resulted in Williams being found mentally defective, the second in his being adjudged delinquent, this time on the basis of the offenses committed while at Pennhurst.[3] The Juvenile Court therefore granted

---

[2] More specifically, both appellants were found "moderately defective". There are, according to the expert testimony below, three levels of mental defectives: mild, moderate and severe. From the standpoint of the psychologist these levels depend on the I.Q. of the individual; an I.Q. less than 50 equates with a severe defective, 50 to 70 with a moderate defective, 70 to 80 with a mild defective. It appears that these gradations were formally associated with the terms idiot, imbecile and moron, although doctors now prefer a more clinical nomenclature.

[3] Counsel for appellants initially argued before the Juvenile Court that his clients could no longer be sent to Dallas since they were no longer delinquent. He claimed that their institutionalization at Pennhurst, a noncorrectional facility, operated to erase

Pennhurst's discharge petition and simultaneously committed Williams to Dallas.

The life of Ardry Jones has been equally tragic. Born in 1949, Jones had his first contact with the Juvenile Court in 1956 as a result of behavioral problems in school. In 1962 he was arrested and charged with indecent exposure. As with Williams, the Juvenile Court suspected Jones' mental condition and ordered medical examinations. Again the diagnoses of the psychiatrist and psychologist were in accord: subject was mentally defective. Jones was therefore ordered held at the Youth Study Center pending acceptance by Pennhurst. He finally entered that institution on the same day as John Williams, April 11, 1963.

Jones' deportment record at Pennhurst unfortunately is practically a carbon copy of Williams'. A total of 40 disciplinary violations in three years, including repeated acts of assault, larceny and sodomy. Accordingly, Pennhurst petitioned the Juvenile Court for Jones' discharge. Hearings were held and Jones was also found mentally defective and delinquent on the basis of his Pennhurst escapades. He too, of course, was committed to Dallas.

Appellants' attack upon the medical testimony used to find both boys defective is twofold. It is first claimed that the psychiatrists and psychologists who examined Jones and Williams failed to find them mentally defective according to the statutory definition of that term. Although the Dallas Act does not define the term "mental defective" both sides concede that the relevant definition is contained in the Mental

Jones' and Williams' delinquent status. The court below responded to this argument by finding appellants delinquent solely on the basis of their activities *after* arriving at Pennhurst, thus mooting counsel's argument both in the Juvenile Court and in this Court.

Health Act of 1951, Act of January 4, 1951 (1952) P. L. 2053, §1, as amended, 50 P.S. §1072(9).[4] That act provides: " 'Mental defective' shall mean a person who is not mentally ill but whose mental development is so retarded that he has not acquired enough self-control, judgment and discretion to manage himself and his affairs, and for whose welfare or that of others care is necessary or advisable. The term shall include 'feebleminded', 'moron', 'idiot' and 'imbecile', but shall not include 'mental illness', 'inebriate' and 'senile'." Appellants' position is that since none of the doctors who examined Jones and Williams said *specifically* that these boys had not "acquired enough self control, judgment and discretion to manage . . . [themselves] and . . . [their] affairs", their commitments to Dallas must be void. We cannot accept this argument.

It cannot be gainsaid that one of the thorniest legal problems connected with mental status, as either a defense or a reason for confinement, is the increasing reluctance of psychiatrists and psychologists to testify using language that conforms to statutory definitions

---

[4] In the 1966 Mental Health Act, Act of October 20, 1966, P. L. 6, §101 et seq., 50 P.S. §4101 et seq. (Supp. 1967), the term "mental defective" is included within the definition of "Mental Disability." The definition of "mental disability" recites: " 'Mental disability' means any mental illness, mental impairment, mental retardation, or mental deficiency, which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care as provided in this act. . . ."

The effect of this new definition is to make possible the nonpenal commitment of persons mentally defective who have nonetheless committed crimes. This is so because the various commitment sections of the act, including those authorizing the commitment of persons charged with crimes, released on bail, awaiting trial, freshly convicted or serving sentences, are all keyed to the term "mentally disabled" and that phrase is in turn keyed only to nonpenal institutions, called "facilities" by the act.

of mental conditions. See, e.g., *Durham v. United States,* 214 F. 2d 862 (D.C. Cir. 1954). This does not mean, however, that a court must reject summarily any expert medical opinion that was not formulated before an open statute book. In the present case, for example, we are dealing with a statute (the Dallas Act) which leaves to the court, not the experts, the ultimate decision of whether an individual is mentally defective with criminal tendencies. The language of the act directs the doctors to examine the person believed defective and then report to the judge whether this examination has led to a finding of mental 'deficiency with criminal tendencies. The court, however, must evaluate this expert testimony, together with the testimony of other witnesses and additional evidence to be received at the court's discretion, and finally determine if the required conditions exist to justify a commitment to Dallas. Thus, while the judge must make *his* findings based on the *statutory* definitions, he is certainly permitted to hear experts who do not specifically recite statutes as part of their diagnoses.

Moreover, the testimony of all four doctors who examined Williams and Jones satisfies us that the Juvenile Court could have quite properly made the finding it did—that appellants were mentally defective within the meaning of the statute. Each boy was examined by both a psychiatrist and a psychologist. Dr. Robinson, the psychiatrist who examined Williams, testified that he found his patient to have "poor social sense, poor self-control and hardly any tolerance for frustration." He further testified that Williams' "hostile and aggressive impulses are acted upon with no judgment or concern for consequences." When asked how he defined the term "mental defective," Dr. Robinson included in his definition the fact that a person so affected would have a "limited ability for judg-

ment." Finally, after hearing defense counsel read the statutory definition of "mental defective," Dr. Robinson unequivocally stated that, in his view, Williams' condition satisfied that definition.

Dr. Stickler, a psychologist, also examined Williams. He was concerned primarily with intelligence level, as measured by the standard I.Q. test. Dr. Stickler told the court that mental defectives generally had I.Q.'s ranging all the way from zero to 80, with three subdivisions existing: zero to 50, severe defective; 50 to 70, moderate defective; 70 to 80, mild defective. He found Williams' I.Q. to be 58, thus making him, by this standard, a moderate defective. Dr. Robinson had also classified Williams as a moderate defective.

Ardry Jones was likewise examined by a psychiatrist and a psychologist. Dr. Wouters, the psychiatrist, concluded that Jones was a mental defective on the basis of a personal interview as well as numerous reports submitted by other doctors who had examined Jones previously. Dr. Wouters testified that Jones had "well-established patterns of handling stress by agression." He also said that "this young man showed very poor judgment, did not grasp situations, did not grasp implications, . . . [and] was unable to adapt to the situation."

Dr. Carol Andrews was the psychologist assigned to Jones' case. She measured his I.Q. at 67, within the moderate defective range. Dr. Andrews reported that psychological tests administered at the direction of Dr. Wouters showed Jones to suffer from "emotional impulsivity and aggressiveness." Furthermore, "difficulties in interpersonal relationships . . . with sexual implications" were detected. It was the firm opinion of this psychologist that appellant was a menace to society.

In addition to disputing the *relevance* of these four doctors' testimony to the statutory standard for mental defective, appellants also take issue with the procedure of the medical examinations themselves, arguing that the diagnoses were based on "unsupported or improper inferences." In passing on this contention, we first point out that all four doctors were eminently qualified to conduct their respective examinations. Even the least experienced of this quartet had conducted over 1500 similar examinations previously. Moreover, the methods used by both the psychiatrists and the psychologists were accepted ones—personal interviews by the psychiatrists, I.Q. and standard personality tests administered by the psychologists.

Under these circumstances we do not think it appropriate for judges or lawyers to question the ability of admittedly qualified doctors to administer accepted tests, conduct interviews, and make diagnoses. Of course, it is up to the trier of fact to accept or reject any expert's ultimate opinion; but that does not mean that laymen should be permitted to speculate on the medical conclusions to be drawn from the specific questions asked and tests administered by trained persons. Thus, the court below, when called upon to determine whether appellants were or were not mentally defective with criminal tendencies had to consider several pieces of evidence, among them being the diagnoses of four doctors. Had that court decided to reject those diagnoses as unworthy of belief we would probably not question its right to do so; however, we will not say as a matter of law that the medical opinions were not valid matters of *evidence* simply because the doctors relied on hearsay during their examinations, or because counsel believes that he is better qualified to evaluate the psychiatric and psychological tests administered.

Taking a realistic look at the evidence in these two cases, one is practically overwhelmed by both the number and consistency of the medical opinions. In addition to Drs. Robinson and Stickler, the lower court received into evidence (as it is specifically permitted to do under the Dallas Act) reports on Williams from two previous psychiatric examinations and one previous psychological testing session. In toto, five medical examinations *all* concluded not only that Williams was mentally defective, but that he functioned as a *moderate* mental defective. Given the frequent disagreements on mental condition which this Court has observed over the years, this degree of consistency in diagnoses is entitled to substantial weight. Similarly, in Jones' case, the court below had the benefit of *six* medical opinions, by three separate psychiatrists and three separate psychologists. All six diagnoses were that Jones was mentally defective, and five of the six concluded that the degree was moderate.

Finally, the court below heard substantial testimony on the actual behavior of both boys at Pennhurst. Professional and lay personnel from Pennhurst recounted, often with lurid details, the 96 separate offenses committed by appellants during their three year stay in that institution. As noted earlier, these offenses ranged from minor disciplinary problems all the way to numerous criminal acts, including assault, larceny, sodomy and arson. In sum, there was more than enough evidence for the trier of fact to conclude, as he did, that these boys were delinquent and had serious criminal tendencies. We therefore hold that the evidence was sufficient to meet the requirements of the Dallas Act.

## The Constitutionality of the Dallas Act

Appellants' constitutional arguments are based on the contention that confinement in Dallas is punish-

ment for a status (being mentally defective) rather than for a specific criminal act. As such the Dallas Act metes out "cruel and unusual punishment" in violation of the Eighth Amendment to the Constitution of the United States. This argument seeks support from two United States Supreme Court cases, *Robinson v. California*, 370 U.S. 660, 82 S. Ct. 1417 (1962) and *Powell v. Texas*, 392 U.S. 514, 88 S. Ct. 2145 (1968).

In *Robinson* a California statute was challenged which made it a crime to be addicted to the use of narcotics. It was possible for an individual to be convicted of this offense even though the state introduced no proof whatsoever that the defendant used narcotics in California or had been apprehended with the drugs in his possession. The trial judge in that case instructed the jury that the violation need not be based on any specific act, but could be based simply upon a "condition or status" of the defendant. In declaring this statute violative of the eighth amendment, the Supreme Court said: "This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status' or narcotic addiction a criminal offense." 370 U.S. at 666, 82 S. Ct. at 1420. In analogizing the California statute to one which might make having a common cold a crime, the Supreme Court indicated clearly the evil in the challenged legislation. Under it a man could be punished for doing nothing; he could be criminally prosecuted for merely being found in a condition, recognized to be a disease, and over which he no longer had any control.

To the extent that *Robinson* carefully refrained from excusing any specific antisocial *acts* flowing from an uncontrollable "status", *Powell v. Texas* looms as an extension of the *Robinson* doctrine. Although Leroy Powell, an admitted alcoholic, had his *conviction* upheld 5-4 by the Supreme Court, the four opinions filed in that case combine to produce an amplification of *Robinson*. Powell was not convicted for merely being an alcoholic, but for being found drunk in a public place. Although in *Powell,* unlike *Robinson,* the challenged statute was punishing a specific act rather than a mere status, counsel argued that Powell could not be held responsible for being found drunk in public any more than he could be held responsible for being an alcoholic in the first place. In theory, at least, a majority of the Supreme Court agreed.

The Chief Justice, Justices BLACK, HARLAN and MARSHALL took the position that *Robinson* should not extend to specific criminal acts allegedly done because of a disease such as narcotics addiction or alcoholism. The four dissenters (Justices DOUGLAS, BRENNAN, STEWART and FORTAS) however, maintained that being in a state of intoxication in public was a "characteristic part of the pattern of his [Powell's] disease and . . . was not the consequence of appellant's violation but of 'a compulsion symptomatic of the disease of chronic alcoholism.' " They therefore voted to reverse Powell's conviction on the authority of *Robinson.* Mr. Justice WHITE was, in a very real sense, the "swing man" in this case. While concurring in the result, he did so only because, in his view, there was no evidence to show that Powell's appearing drunk in public was in fact a characteristic part of his disease. Mr. Justice WHITE found nothing on the record to indicate that appellant could not have confined his drinking to his private house. However, his opinion

announces explicitly that were such evidence present on the record, the Justice would have voted to reverse Powell's conviction on eighth amendment grounds. As a result, *Powell v. Texas* unequivocally holds that to the extent certain behavior is a "characteristic part" of a disease, to the extent that it is an actual *symptom* of the disease, such behavior cannot be criminally proscribed.

In the present case, appellants seek shelter under either or both of the Supreme Court's eighth amendment umbrellas. Their *Robinson* claim, that Williams and Jones are being punished merely for being mental defectives, is clearly without merit. These boys are not confined to Dallas solely because they are mental defectives. Indeed, were that their only problem they would still be in Pennhurst, a nonpenal institution specifically designed for mental defectives. Rather, appellants were transferred to a penal institution because of their antisocial conduct while at Pennhurst, specific criminal acts sufficient to support findings of delinquency.[5]

---

[5] To the extent that appellants are kept in Dallas beyond the time during which they could have been confined to a normal institution for delinquents, such as Camp Hill, this additional confinement would, of course, be solely because of their mental status and accordingly violative of both *Robinson* and *Powell*. However, this situation could never arise by reason of the fact that appellants' commitments to Dallas must expire when they reach the age of twenty-one, a point coterminous with the maximum sentence they could have received had they been sent to Camp Hill as normal delinquents. The Juvenile Court, by which both boys were sentenced, loses jurisdiction over persons when they attain majority.

Should it be felt that either appellant requires continued care after he reaches twenty-one, the 1966 Mental Health Act permits only *civil* commitment, as though no crimes have been committed. Since Williams and Jones would have already served the maximum correctional sentence which the Juvenile Court could have meted out, any post-majority proceedings in the absence of any

The argument based on *Powell,* however, requires much closer scrutiny. Counsel for appellants constructs the following syllogism to demonstrate a *Powell* violation: In order to be in Dallas, appellants must be mentally defective; to be mentally defective under the laws of Pennsylvania one must be unable to control his behavior; therefore, since Williams and Jones were unable to control their behavior the crimes committed while at Pennhurst (sine qua non's for their Dallas commitments) were not *responsibly* committed thus rendering punishment for these crimes impermissible under *Powell* and the eighth amendment. We believe that this syllogism breaks down in several spots.

Appellants concede, as they must, that there was no *direct* testimony introduced below to show that their Pennhurst misconduct was anything other than voluntary. Nevertheless, Jones and Williams point to our statutory definition of "mental defective" and argue that thë language of that definition itself necessitates a conclusion that one so afflicted cannot control his behavior. The statutory language, set out supra, indicates that defective status is reached when a person "has not acquired enough self-control, judgment and discretion to manage himself and his affairs." We do not think this definition so colors the status of mental defectives in Pennsylvania however as to make criminal conduct an actual symptom of the condition itself. Simply because a man lacks the ability to manage himself or his affairs does not mean that he will, of necessity, commit crimes. And, as we read the language of the *Powell* dissent, any act that is not so necessitated by the condition may still be criminally proscribed. It is simply not enough to say that in a

criminal convictions would therefore be governed by the Act of October 20, 1966, P. L. 6, §406, 50 P.S. §4406 (Supp. 1967), the civil commitment section of the new mental health act. .

particular case a particular act was caused by the disease. One must be able to conclude that the antisocial conduct is *part* of the disease, by definition. Merely to compare the act of an alcoholic getting drunk in public with the act of a mental defective committing larceny should be enough to underscore the *Powell* boundary line for criminal responsibility. Every alcoholic gets drunk. That he does so publicly is, to the four dissenting Justices in *Powell,* no more a specific punishable act than an epileptic's having a seizure on the street rather than in his home. By contrast, there was testimony below that 95% of mental defectives are *not* a menace to society at all. (Jones' hearing at page 49.)

The dissenters in *Powell* specifically stated that the case before them did not "concern the responsibility of an alcoholic for criminal *acts.* We deal here with the mere *condition* of being intoxicated in public." 392 U.S. at 559, 88 S. Ct. at 2167. (Emphasis in original.) Even more significant is the footnote to this quoted passage. "It is not foreseeable that findings such as those which are decisive here—namely that the defendant's being intoxicated in public was a part of the pattern of his disease and due to a compulsion symptomatic of that disease—could or would be made in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery. Such offenses require independent acts or conduct and do not typically flow from and are not part of the syndrome of the disease of chronic alcoholism. If an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment." 392 U.S. at 559, n.2, 88 S. Ct. at 2167, n.2.

There can be little doubt that the commission of a crime by an alcoholic while intoxicated is, in one sense, no more "voluntary" than the commission of antisocial acts by a mental defective. But the Supreme Court continues its refusal to exonerate the criminal conduct of alcoholics unless that conduct be symptomatic of the disease itself. The reason for this would seem to be a belief on the part of the Supreme Court Justices that to excuse particular acts, not ordinarily symptomatic of a disease or mental condition, simply because the defendant can demonstrate a causal connection between his affliction and his crime would be tantamount to establishing a constitutional test for insanity, a doctrine heretofore eschewed. *Leland v. Oregon,* 343 U.S. 790, 72 S. Ct. 1002 (1952). Thus, absent any proof below that appellants' crimes were characteristic or symptomatic of their mental condition, their constitutional arguments must fail.

## The Treatment Afforded at Dallas

Appellants rely on two authorities for the proposition that their commitments to Dallas must be overturned due to inadequate treatment at that institution: an extensive discussion of the defective delinquent in Pennsylvania appearing at 12 Vill. L. Rev. 545 (1967), and a case decided by the United States Court of Appeals for the District of Columbia, *Rouse v. Cameron,* 373 F. 2d 451 (D.C. Cir. 1966). While we are in sympathy with appellants' contention that Dallas may be far from a model institution, we fail to see how either of the cited authorities supports court intervention in the area of defective treatment.

The authors of the Villanova study conclude with an appeal to the Legislature, not the courts. In committing appellants to Dallas, the court below acted in accordance with the statute then in effect. It properly

adjudged both boys defective delinquents, and having done so was entirely correct in its commitment decision. We realize that Dallas is understaffed and oriented far more toward confinement than treatment. We agree that a change in the internal operations of Dallas must come from the Legislature, not from us. In fact, the Legislature has now begun to act in this very area. The Dallas Act under which appellants were committed has been repealed. (See note 1, supra); and the 1966 Mental Health Act, by including mental defectives within the definition of "Mental Disability" makes it possible in the future for such persons to be given hospital as well as prison treatment. (See notes 4 and 5, supra.)

Admittedly, *Rouse v. Cameron,* supra, is authority for the proposition that courts, under proper circumstances, will pass judgment on the treatment being afforded persons confined to state institutions. However, for any one of a number of reasons, *Rouse* has absolutely no application whatsoever to this case. First, and most significant, *Rouse* proceeds on the notion that one has a constitutional right to treatment when involuntarily confined to a mental hospital following an acquittal, by reason of insanity, of a criminal offense. This result follows *not* from the mere fact that one is in custody, but rather from the *nature* of that custody. Relator in *Rouse* was not in a penal institution, he was in a mental hospital whose only justification for confining him was his need for medical treatment. Having been found guilty of no crime, he could not be kept in custody for any reason other than treatment. It follows inexorably therefore that the court in *Rouse* had no choice but to find relator entitled to proper treatment. To hold otherwise would be tantamount to permitting involuntary hospitalization for no reason other than pure confinement, an obvious due process violation.

By contrast, appellants are admittedly in a penal institution. *Commonwealth v. Storm,* 185 Pa. Superior Ct. 136, 138 A. 2d 140 (1958). Their confinement could be justified solely on the ground that they are delinquents. Furthermore, whereas *Rouse* proceeds along constitutional lines, appellants in the present case merely level a broad based attack on Dallas with no constitutional argument based upon the treatment there afforded. Finally, even the constitutional discussion in *Rouse* is dictum only, since the court really relied on a federal statute requiring that persons "hospitalized in a public hospital for mental illness" receive medical and psychiatric care. This statute has no application to appellants who are neither mentally ill, nor hospitalized.

For all the foregoing reasons, we hold that appellants were properly committed to Dallas under the laws in effect at the time of those commitments.

Orders affirmed.