J-A10040-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| KHALEED CRUMP | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CRAIG SOKOLOW AND FRAN | : | No. 1750 EDA 2022 |
| GOLDSLEGER | : | |

Appeal from the Judgment Entered August 19, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  200801434

BEFORE:   PANELLA, P.J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 24, 2023**

Plaintiff/Appellant Khaleed Crump ("Appellant") appeals from the judgment entered in the Court of Common Pleas of Philadelphia County at the conclusion of his personal injury trial after the jury found Defendants/Appellees Craig Sokolow and Fran Goldsleger ("Appellees") were negligent, but that such negligence caused no compensable injury to Appellant.  After careful consideration, we affirm.

The present case arises out of a motor vehicle collision that occurred during the early afternoon of January 26, 2020, in the City of Philadelphia, when Appellee Sokolow drove a motor vehicle at approximately 25 miles per hour into the vehicle of Appellant.  On February 11, 2020, Appellant sought medical treatment for what was diagnosed as a knee contusion, which,

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant reported, had occurred when his knee struck the steering column of his vehicle during the motor vehicle accident in question.

On February 18, 2020, Appellant began a prescribed "course of therapy consisting of ultrasound, EGS manipulation and a structured therapeutic exercise program to tolerance." Nevertheless, Appellant subsequently complained to his treating physician of progressively worsening right knee pain, stiffness, and clicking since the time of the accident. Plaintiff's Trial Exhibit A, Report of Geoffrey W. Temple, D.O., 6/14/20, at 1-2.

On April 28, 2020, Appellant underwent an MRI scan of the right knee. According to the interpreting radiologist, the MRI scan was "unremarkable," as it showed all internal structures, ligaments, and tendons were intact. *Id*. Dr. Temple reviewed the MRI report and images and concurred with the radiologist's impression. *Id*.

On June 3, 2020, Dr. Temple reassessed Appellant. In addition to sharing his impression of the normal MRI, he performed motion testing of Appellant's right knee. His report indicated a normal range-of-motion without restrictions, the absence of effusion (fluid that causes swelling) or instability, and a demonstration of full strength at the joint, which he rated a "5/5." *Id*. Dr. Temple noted further:

> [Appellant] had anterior knee pain on deep palpation. . . . I do feel he suffered a deep knee contusion at that time [of the accident] and responded to the therapy provided with occasional pain. I released him from my active care at that time. He was asked to continue his own home exercises and return to the office

if there was any significant change in the residual pattern of symptoms around which he learned to adjust his daily activities.

. . .

The diagnosis in my report are directly related to the trauma of January 26, 2020. He has a guarded-good prognosis. . . . Also, he has suffered shearing forces to the myoligamentous supporting elements of the right knee which will pre-dispose him to joint laxity, joint instability, and also subsequent trauma.

While he has improved maximally, he has not recovered completely. . . . He suffered a significant impairment of bodily function. . . . Again, he has a guarded-good prognosis. The opinions in my report are rendered within a reasonable degree of medical certainty.

*Id*. at 2.

On July 30, 2020, Appellant sought the care of Clifton Burt, M.D., to address what he reported as his continuing right knee pain. Dr. Burt noted a negative Lachman Test (to assess for ACL injury), no medial or collateral instability with the joint, and negative MRI findings. Plaintiff's Trial Exhibit C, Report of Clifton Burt, M.D., 7/30/20, at 1. Nevertheless, given the duration of Appellant's complaints of pain symptoms, Dr. Burt concluded that it was "medically necessary to perform right knee Geniculate nerve radiofrequency ablation." *Id*.

As discussed, *infra*, an ablation of the geniculate nerves involves inserting into the knee three needles, one placed at each nerve, and delivering through the needles a radiofrequency wave that generates sufficient heat, approximately 115 degrees Fahrenheit, to burn the nerve and stop it from transmitting a pain signal to the brain. At the time of the procedure, Appellant

reported a 40% improvement in his pain level for 30 minutes. Dr. Burt thus made the decision to proceed with the radiofrequency ablation at the same level. *Id*.

On August 18, 2020, Appellant commenced the present personal injury action by filing a complaint in negligence, alleging that Appellee Craig Sokolow negligently or carelessly caused the parties' motor vehicle collision, which resulted in serious and permanent personal injuries to, among other things, his right knee. During discovery, Appellant filed an expert medical report prepared on September 15, 2020, by his proposed medical expert, Lance Yarus, D.O.

In his report, Dr. Yarus explained that although he had not personally seen or examined Appellant, he had reviewed Appellant's relevant medical history and reports, which, he indicated, had described that Appellant suffered an auto collision-related contusion, synovitis, and enthesopathy of the right knee that continues to cause him pain. Among the conclusions he drew from his records review was that Appellant suffered a "suspected internal derangement with structural tear, either meniscus, or cruciate, or both with cartilage surface injury of right knee." Plaintiff's Trial Exhibit B, Report of Lance Yarus, D.O., 9/15/20, at 3. Dependent on this conclusion were the "guarded" prognosis he assigned Appellant and his medical opinion regarding related future costs of medical care Appellant would incur. *Id.* at 4. His report indicated that he offered this and all conclusions to a reasonable degree of medical certainty. *Id.* at 5.

- 4 -

On April 18, 2022, Appellees filed a Motion *in Limine* to preclude Dr. Yarus from testifying it was his expert medical opinion that Appellant had a "suspected" internal derangement of the right knee. Specifically, Appellees contended that a "suspected" injury was not an injury that a medical expert can find to within a reasonable degree of medical certainty. This was particularly so, Appellees argued, given the MRI imaging and accompanying radiologist's report, with which all reviewing physicians concurred, indicating a normal, "unremarkable" study showing all internal structures of the knee to be "intact."

On May 19, 2022, the trial court entered an order granting in part Appellees' Motion *in Limine*. Pursuant to the order, neither Dr. Yarus' opinion regarding the suspected internal derangement nor his opinion about any future medical treatments or costs of said treatments were admissible at trial.

On May 20, 2022, Appellant filed a Motion for Reconsideration based on Dr. Yarus' videotaped deposition. Therein, Appellant maintained that Dr. Yarus "testified, specifically, that he believes Plaintiff to have internal derangement based on Plaintiff's symptomology, that is, the locking, popping, giving way, and stiffness of which Plaintiff complained, and that [Dr. Yarus] was 'certain' and 'not guessing' about the internal derangement." Motion for Reconsideration, 2/20/22, at 3.

On May 23, 2020, the trial court heard oral arguments on Appellant's Motion for Reconsideration, and agreed with Appellees' position that because Dr. Yarus had based his testimony regarding a continuing injury and the future

costs associated with such injury on his suspicion that Appellant has internal derangement of the knee, his medical opinion on both was inadmissible. Accordingly, the trial court denied Appellants' motion for reconsideration of the May 19, 2022, order.

Also challenged by way of a motion *in limine* was Dr. Yarus' use as of a stock photograph of a knee undergoing genicular nerve ablation as an illustrative aid to his testimony. The trial court asked if the photograph accurately depicted the procedure Appellant underwent, and counsel for Appellant confirmed that it was. Appellees objected to the admission of the photograph, arguing that it had not been produced during discovery despite Appellant's request for such demonstrative evidence. After entertaining arguments on the point, the trial court granted Appellees' motion, noting the demonstrative had not been available to Appellees' doctor or any other expert. N.T. at 16.

Trial commenced on May 23, 2020, and featured the testimony of fact witnesses Appellant and Appellee Craig Sokolow, and a video replay of Dr. Yarus' deposition testimony. On May 24, 2022, the jury returned a verdict in favor of Appellees, finding Defendant Craig Sokolow negligent but that his negligence was not a factual cause of injury to Plaintiff/Appellant. N.T. 5/24/22, at 69; Verdict Sheet, p. 1.

On June 3, 2022, Appellant timely filed a Motion for Post-Trial Relief in which he charged the trial court had erred and abused its discretion in precluding part of Dr. Yarus' deposition testimony and the stock photograph

- 6 -

depicting a close up of a knee ablation patient's knee with three needles inserted. The trial court denied the motion on June 23, 2022. This timely appeal followed.

Appellant raises the following issues for this Court's consideration:

1. Whether the trial court abused its discretion and otherwise committed an error of law when it precluded [Appellant's] medical expert, Dr Lance Yarus, D.O., from testifying that [Appellant] suffered internal derangement of the right knee as a result of the subject accident, and subsequently denied [Plaintff/Appellant's] Motion for Reconsideration of same?

2. Whether the trial court abused its discretion and otherwise committed an error of law when it precluded [Appellant's] medical expert, Dr. Lance Yarus, from testifying that [Appellant] would require future medical treatment for injuries sustained in the subject accident, and subsequently denied [Appellant's] Motion for Reconsideration of same?

3. Whether the trial court abused its discretion and otherwise committed an error of law when it precluded [Appellant's] medical expert, Dr. Lance Yarus, D.O., from presenting a demonstrative photograph of the procedure [Appellant] underwent following the subject accident?

4. Whether the trial court abused its discretion and otherwise committed an error of law when it improperly denied [Appellant's] Motion for Post-Trial Relief by way of Order dated June 23, 2022, and Supporting Opinion dated January 4, 2023?

Brief for Appellant, at 8.

At the center of Appellant's first two issues is his challenge to the trial court's ruling that precluded Dr. Yarus from offering at trial his opinion that the car collision in question caused Appellant to suffer an internal derangement of the right knee. As discussed, preclusion was based on the

trial court's determination that Dr. Yarus failed to support his opinion with an adequate degree of medical certainty when he could opine only that the injury was "suspected."

It is well-settled that in Pennsylvania, "our Supreme Court has emphasized [that an] expert must base the substance of her opinion on a reasonable degree of certainty instead of mere speculation." **Commonwealth v. Gonzalez**, 109 A.3d 711, 727 (Pa. Super. 2015), *appeal denied*, 125 A.3d 1198 (Pa. 2015) (citation omitted); **Accord**, **Commonwealth v. White**, 285 A.3d 912 (Pa. Super. Ct. 2022), appeal denied, No. 263 EAL 2022, 2023 WL 2579748 (Pa. Mar. 21, 2023). On this point, we have long observed:

> an expert need not testify with absolute certainty or rule out all possible causes of a condition. [**Mitzelfelt v. Kamrin**, 584 A.2d 888, 891 (Pa. 1990)]. Likewise, the testimony need not be expressed in precisely the language used to enunciate the legal standard. **See In re Jones**, 432 Pa. 44, 246 A.2d 356 (1968) (medical testimony need not conform to precise statutory definitions). Rather, expert testimony should be reviewed in its entirety to assess whether it expresses the requisite degree of medical certainty. **McCann v. Amy Joy Donut Shops**, 325 Pa. Super. 340, 343–44, 472 A.2d 1149, 1151 (1984) (*en banc* "An expert fails this standard of certainty if he testifies 'that the alleged cause "possibly", or "could have" led to the result, that it "could very properly account" for the result, or even that it was "very highly probable" that it caused the result.'" **Kravinsky v. Glover**, 263 Pa.Super. 8, 21, 396 A.2d 1349, 1356 (1979) (citations omitted).

**Hoffman v. Brandywine Hosp.**, 661 A.2d 397, 402 (Pa. Super. 1995) (superseded by statute on other grounds).

Here, Dr. Yarus opined during his deposition testimony that both Appellant's enduring subjective complaints of pain, clicking, and stiffness and medical records describing a contusion of his right knee at initial presentation caused Dr. Yarus to "suspect" a derangement of the knee's internal structures. Deposition, 5/11/22, at 23-24. He acknowledged Appellant's normal MRI study of April 28, 2020, which, he admitted, "didn't show any evidence . . . of disruption of the internal structures" and showed that the ligaments, menisci, and tendons all "were intact", but he opined that the normal MRI did not eliminate reason to pursue Appellant's persistent complaints. N.T. at 27.

Dr. Yarus continued, "[S]ometimes MRIs don't show you, uh, structurally or morphologically what may be causing a person's symptoms. "When people present with . . . locking, popping, giving way, stiffness, things that [Appellant] described, and after treatment,[1] he has a continuing of those symptoms, those are internal derangement until proven otherwise." N.T. at 27. Dr. Yarus opined that with respect to the value of diagnostic studies, "[w]hether the MRI is normal or not doesn't really matter in the big picture[,]" and he dismissed the notion that repeating such imaging would be of any value. N.T. at 35.

Instead, he maintained that consideration of Appellant's post-collision history coupled with a diagnostic arthroscopy was required to discern the

---

[1] Elsewhere in his deposition testimony, Dr. Yaris discussed his review of records from "Premier Pain & Rehab", which indicated that Appellant underwent a July 30, 2020, genicular block or ablation procedure of three nerves in his knee to reduce pain. N.T. at 28-29.

injury in this case. "[I]t's the [patient] history that drives the . . . ability to - - to recommend care[,]" he opined, and "[y]ou have to look directly with the scope; that's what it's for." N.T. at 27-28. [T]he scope is a diagnostic tool." N.T. at 35. In other words, Dr. Yarus opined that only an arthroscopy would reveal whether Appellant sustained internal derangement of the knee consisting of a structural tear with cartilage injury. He concluded his direct examination by affirming that he offered this opinion within a reasonable degree of medical certainty. N.T. at 36.

The degree of certainty regarding his opinion of Appellant's injury, therefore, became the subject of cross-examination, during which Dr. Yarus conceded that in his written report he described his findings as "suspected internal derangement." N.T. at 36.[2] He confirmed further that his findings derived from Appellant's persistent subjective complaints both documented in medical records and conveyed to him during a phone conversation, as he neither met nor examined Appellant in person. He stated, "I believe it's there because of his symptoms[,]" N.T. at 41, and he also agreed that Appellant's subjective complaints were the source of such recorded symptoms.

The speculative nature of Dr. Yarus' inferences, however, were underscored when he opined that only an arthroscopic evaluation of the knee would reveal the presence and extent of Appellant's suspected injury.

---

[2] His complete entry stated, "Suspected internal derangement with structural tear, either meniscus or cruciate or both, with cartilage surface injury of the right knee." N.T. at 37.

Specifically, when asked on redirect examination to explain the need for arthroscopic evaluation of the knee, he offered that Appellant's persistent complaints after reasonable care are the reason to do the scope, regardless of the MRI, and the presence and extent of the injury was "a part of the equation, uh, that, uh, will not be understood until a scope is placed in the knee. There has to be a reason for his continuing complaints and his inability to function." N.T. at 47.

Under our cited jurisprudence, an expert's suspicion of an injury does not meet the requisite threshold of rendering an expert opinion to a reasonable degree of medical certainty. Here, Dr. Yarus admitted he only suspected Appellant had internal derangement of the knee because Appellant continues to complain of pain and suffered a contusion and swelling of the knee at the time of the accident. This despite an MRI that showed all components of the knee to be intact and a June 3, 2020, examination in which Dr. Temple found Appellant's right knee displayed a normal range of motion without restrictions, full strength (rated "5/5"), no sign of instability, and no evidence of effusion. Dr. Yarus conceded it was his opinion, moreover, that it is impossible to discern whether an internal derangement exists without conducting an arthroscopy, which has not been performed in this case. Confronted with this evidence, therefore, the trial court appropriately ruled Dr. Yarus' opinion was speculative and, thus, inadmissible at trial. Accordingly, Appellant's first two issues are devoid of merit.

The remaining two issues coalesce to assert that the trial court erred and abused its discretion when it deemed inadmissible a stock photograph of a genicular nerve ablation procedure that Dr. Yarus used as an illustration during his videotaped testimony discussing the same procedure performed on Appellant. At the deposition of Dr. Yarus, counsel for Appellees raised an unfair surprise objection to the picture when it was presented, partly because Appellant had not produced or disclosed it previously during discovery, as required under Pa.R.C.P. 4009.11, in response to Appellee's requests for production of documents.[3] The objection was preserved for trial court review, and Dr. Yarus continued his deposition testimony in which he referred to the photograph to aid his explanation of Appellant's knee ablation procedure.

The trial court entertained argument on Appellees' *motion in limine* to exclude the photograph in question. Counsel for Appellees reiterated that Appellant failed to produce the photograph during discovery and, thus, unfairly surprised Appellees when Dr. Yarus referred to it during his expert testimony. Counsel for Appellees emphasized that "a surgery photograph is very prejudicial. It shows a person having surgery on their knee. It's obviously not the plaintiff. It was never produced. I don't think that that picture should be shown to the jury." N.T., 5/23/22, at 12.

---

[3] During discovery, Appellant's "Request for Production of Documents" asked for "Any and all documents . . . which Plaintiff(s) plan to have marked for identification at a deposition or trial, introduce into evidence at a deposition or trial, or about which Plaintiff(s) plan to question a witness at a deposition or trial. R. 543.

Counsel for Appellant countered that Dr. Yarus explained Appellant underwent a genicular nerve ablation procedure to his knee, and then used a stock picture of such a procedure to assist the jury in understanding what such a procedure entails. Indeed, the question initially posed to Dr. Yarus was, "Do you have a model or anything to show us to indicate what the procedure was, where it was performed?" N.T. at 12.

Counsel argued that the picture was "literally a [photograph] of somebody's knee with the needles in it to show what the ablation procedure was." N.T. at 13. He continued, "This is a demonstrative Dr. Yarus used. It's aiding the jury to better understand the procedure that Mr. Crump went through, the ablation. That's all it was. It's not a moving film of anything. It's just a picture of a knee to show what the ablation was. . . . I believe the standard is if it aids the jury to better understand what the doctor is talking about, it's admissible. I would argue it's admissible." N.T. at 13. When asked by the trial court if the photograph was a true and accurate representation of Appellant's procedure, counsel for Appellant reiterated that Dr. Yarus showed the photograph while explaining what Appellant underwent. N.T. at 14.

The trial court reserved ruling until it viewed the picture for unduly graphic or irrelevant content. N.T. at 14. While waiting for the videographer to retrieve the photograph, counsel for Appellees repeated his objection that the photo was never produced in discovery, was of a different person, and was a "picture of a man with iodine all over his knee and surgery and medical

instruments."[4]  N.T. at 14.  To his latter objection, counsel for Appellees added that the photograph depicted a surgical procedure "clearly" performed in a hospital, which would be materially different from the outpatient procedure Appellant described in his testimony.  Counsel for Appellant replied accurately, "You can't tell that.  It's just a picture of a knee."  N.T. at 15.

After reviewing the photograph, the trial court sustained Appellees' objection, agreeing with Appellees' initial position that Appellant's failure to produce the photograph pursuant to Appellees' discovery request unfairly handicapped Appellees in the preparation of their defense.  Specifically, the trial court explained, "Dr. Yarus used a demonstrative during his testimony that hadn't been used with their doctor or any other expert.  And as a result, I sustained the objection that it not be presented to the jury."  N.T. at 16.

With regard to discovery disputes, we have explained:

> Preliminarily, we note the "'[t]he purpose of the discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits.'"  Pennsylvania Rule of Civil Procedure 4019 provides for sanctions if a party fails to provide discovery. "The decision whether to sanction a party, and if so the severity of such sanction, is vested in the sound discretion of the trial court." When a court refuses to impose sanctions, we must review the evidence to determine whether the court abused its discretion.

*Dominick v. Hanson*, 753 A.2d 824, 826 (Pa.Super. 2000) (internal citations omitted).  According to Pa.R.C.P. 4019, a trial court may "make an appropriate

---

[4] As discussed more fully, *infra*, the photograph in question is a close-up of a patient's knee in which three long needles have been inserted.  As explained by Dr. Yarus, a radiofrequency wave then is directed through the needle to the targeted nerve.

order" if a party "fails to make discovery or to obey an order of court respecting discovery." Pa.R .C.P. 4019(a)(1)(viii). "[T]he decision whether to sanction a party for a discovery violation and the severity of such a sanction are matters vested in the sound discretion of the trial court." *Philadelphia Contributionship Ins. Co. v. Shapiro*, 798 A.2d 781, 784 (Pa. Super. 2002). . . . This Court has held that when a party has failed to produce evidence during discovery, an appropriate sanction is prohibiting admission of the evidence at trial. *Duncan v. Mercy Catholic Med. Ctr. of Southeastern Pa.,* 813 A.2d 6, 12 (Pa. Super. 2002).

As noted above, the trial court had entered a Case Management Order during discovery requiring Appellant's counsel to identify all exhibits that were to be used at trial. Within the court's order was the admonition, "Counsel should expect any exhibit not listed to be precluded at trial." There is no dispute that the picture in question was neither submitted during discovery nor included in Appellant's pre-trial memorandum but was, instead, first presented at the videotaped deposition of Dr. Yarus to be used at trial. Referencing, *inter alia*, that Appellees' expert had been deprived of the opportunity to examine the photograph, the trial court acted on its prior admonition and ruled the photograph was inadmissible at trial. We discern no error with the trial court's decision to enforce the terms of its Case Management Order.

Even assuming, *arguendo*, that any unfair surprise was *de minimus* and, thus, provided insufficient reason to preclude use of the photograph, we would

decline to find reversible error in this instance where Appellant's medical expert, Dr. Yarus, provided the jury with a detailed and comprehensive explanation of the procedure.

Appellant argues that the purpose of introducing the photograph of the ablation procedure was to show he chose to undergo such an invasive procedure because he was genuinely experiencing pain in his knee following the accident. Nevertheless, he acknowledges that the photograph illustrated the testimony of Dr. Yarus, which not only detailed the invasive ablation procedure completely for the jury but also explained that the procedure is undertaken to remedy a patient's complaints of pain.

To this end, Dr. Yarus indicated that Appellant presented at Premier Pain & Rehab on July 30, 2020, to treat with Dr. Clifton Burt, who performed genicular blocks on three nerves located inside Appellant's knee to try to reduce pain. N.T. at 28.[5] The jurors first observed Dr. Yarus refer to a medical drawing illustrating the internal anatomical structures of the knee, and they watched him use the illustration to identify the location of the nerves, explaining they were the ones blocked or ablated during Appellant's radiofrequency ablation procedure. N.T. at 29-30.

The doctor then transitioned to the second illustration, which consisted of a still, color photograph of an actual knee ablation procedure. The depiction is limited to a close-up of a bare knee with three small needles or probes

---

[5] It was at this time that Appellees' counsel noted his objection to "any kind of models or pictures or anything like that, that wasn't produced." N.T. at 28.

inserted. Iodine appears to have been applied to the surface of the knee, and some of the iodine appears to have run onto the edge of the paper dressing.

Although the photograph was "blacked out" in the video pursuant to the trial court's ruling, the jury still observed the video of Dr. Yarus describing in detail what was depicted in the obscured photo and how the ablation procedure is performed. Specifically, Dr. Yarus related the photograph to the previous medical drawing—which the jury had viewed—that illustrated the location of each genicular nerve among the internal structures of the knee, and he described how three ablation probes, or needles were placed in the knee to ensure each would contact its corresponding nerve and deliver the radiofrequency wave to burn the nerve and block the pain signal it was emitting to the brain:

> And, then, uh I have another demonstration. This is actually a placement of the needles, uh, that were the nerves that are going to be ablated.
>
> [a brief delay occurs while the videographer retrieves the photograph]
>
> So, this is representing the three, uh, nerves that, uh, would be ablated. Certainly, again, this is not Mr. Crump. This is a live, uh, person that, uh, is being used just to show where the needle placement is.
>
> Through the needle will come a device that's hooked up to a machine that will generate energy at the tip of the probe that goes through down to nerve. . . . In some cases, uh, I believe in the case of Dr. Burt [who performed the procedure on Appellant], they outline the nerve with dye using a fluoroscope, and that's how you know where the placement is. Once you're up on the nerve, this probe is sent down, and then, energy is placed through the probe. It's about 80 degrees Celsius, which is 115 Farenheit, and that's

enough to burn those nerves right where the needles are. It takes
about 30 minutes, total, to do the procedure.

N.T. at 31-32.

Dr. Yarus concluded his presentation of the genicular ablation procedure by offering his opinion that it was "medically necessary, reasonable, and related to the accident[,]" and that he would recommend repeating it to "knock[] out the pain" to enable Appellant "to function a little better[.]" N.T. at 32, 34.

This record establishes that the photograph in question was largely cumulative of Dr. Yarus' detailed testimony, particularly when one considers that the photograph's purpose, according to Appellant, was to convince the jury that he was genuinely in pain by showing he was willing to undergo an invasive procedure to address it. The photograph thus offered little if any probative value beyond Dr. Yarus' detailed testimony describing the invasive nature of the ablation procedure. Therefore, we conclude that any prejudice Appellant incurred by the court's ruling precluding the admission of the ablation photograph was *de minimus* and cannot support his claim of reversible error.[6] Accordingly, we discern no merit to Appellant's challenge.

Judgment affirmed.

---

[6] We thus distinguish the present matter from decisions acknowledging that an expert medical witness's testimony, conveyed in appropriate clinical language, regarding the nature of injuries or cause of death does not render photographic evidence merely duplicative. ***See***, ***e.g.***, ***Commonwealth v. Pruitt***, 951 A.2d 307, 319 (Pa. 2008) (discussing cases in which photographs depicting the brutality of beatings and the deep and gaping wounds involved were essential to prove criminal intent, even when a medical examiner had described the nature of the victims' injuries).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/24/2023