Charles D. **POUNCEY**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 18565.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 17, 1964.

Decided June 30, 1965.

Burger, Circuit Judge, dissented.

Mr. Dickson R. Loos (appointed by this
court), Washington, D. C., for appellant.

Mr. David W. Miller, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and BURGER, Circuit Judge.

EDGERTON, Senior Circuit Judge:

This is an appeal from a conviction for assaulting a Federal officer. 18 U.S.C. § 111. The alleged assault occurred while appellant was in the United States Courthouse in the District of Columbia, but not in a courtroom, awaiting a hearing on his motion to withdraw a guilty plea he had entered in another case. In discussing that motion with his counsel he became agitated and boisterously threatened to leave the room. When he seemed about to do so, there was a struggle between him and the attending Deputy Marshal on which the assault charge is based.

 Appellant urges that the trial court erred in failing (1) to direct a verdict of acquittal; (2) to direct a verdict of not guilty by reason of insanity; and (3) to subpoena a ward attendant from St. Elizabeths Hospital, by whom appellant hoped to show that his mental examination at the Hospital was inadequate. We think none of these matters requires reversal. The evidence was ample to establish guilt unless the jury believed the insanity defense. That defense, though meritorious, was not so overpowering as "to compel a reasonable juror to entertain a reasonable doubt concerning the accused's responsibility." McDonald v. United States, 114 U.S.App. D.C. 120, 123, 312 F.2d 847, 850 (1962). Refusal to call the ward attendant was not an abuse of discretion. Calling him would have necessitated a continuance late in the trial, and his testimony would necessarily have been limited to the time he was on duty.

 An issue not urged at trial but briefed at our request on appeal is whether appellant's behavior during the trial required reconsideration of his competence. Shortly after the outburst which led to this prosecution, appellant's new counsel raised questions of his mental condition at the time of the crime and his competence to stand trial. He was sent to St. Elizabeths Hospital for a mental examination. The Superintendent of the Hospital reported in conclusory terms that he was without mental disease or defect and competent to stand trial. Counsel did not request a hearing on competence and no formal action on the report was noted.[1] Though it would have been better to get more light on the question of competence, our *in banc* decision in Whalem v. United States, 120 U. S.App.D.C. ──, 346 F.2d 812 (1965), precludes a decision that the trial judge abused his discretion in permitting the case to go to trial. But a judge's responsibility to guard against the possibility that an accused person may have become incompetent does not end when the trial begins. A hospital report is only a prediction that when the accused is tried he will be able to participate adequately in the proceedings. Later developments may throw doubt on the prediction, particularly when, as in this case, the report does not show the hospital's understanding of "competence", the tests it employed, or the certainty of its diagnosis.[2]

Some occurrences at trial tend to support the Hospital's prediction. Appel-

1. Compare Chief Judge Bazelon's dissent in Whalem v. United States, 120 U.S.App. D.C. ──, ──, 346 F.2d 812, 819 (1965), on counsel's responsibility.

2. Whalem v. United States, *supra*, 120 U.S. App.D.C. p. ──, 346 F.2d p. 816 n. 6. Compare Amador Beltran v. United States, 302 F.2d 48, 50 (1st Cir. 1962).

The need for observation and response by the judge during the trial is the greater because he may not have seen the defendant or his counsel before trial. Observation of defendant and discussion with counsel during trial may be the judge's only source of specific information.

lant testified lucidly and relevantly when he first took the witness stand. When he afterwards interrupted counsel's cross-examination of a St. Elizabeths psychiatrist to undertake his own, the question he asked was to the point. The psychiatrist's testimony supplemented the Hospital's report and revealed that there was no disagreement in the examining panel as to the psychiatric conclusions reached. The psychiatric testimony, generally, negated any serious mental defect or illness.

On the other hand, there were significant events throwing grave doubt on the Hospital's prediction. At the beginning of the trial, appointed counsel informed the court that appellant had just accused him of being "in cahoots with the Government, that [he] was part of a conspiracy to send [appellant] to jail. * * *" Later, previous counsel testified to events which showed that appellant had a habit of distrusting his attorneys. After two major defense witnesses had testified on the question of appellant's sanity, a recess was called so that he and his counsel could confer. Counsel informed the court that, during the recess, appellant had again accused him of being "in league with the prosecutor to more or less hurt him." Shortly thereafter appellant expressed a wish to retake the witness stand. He said, in the jury's presence, "Plead me guilty to the charge." [3]

■ As the Government says in its brief: "[Competency] denotes the intellectual and emotional capacity of the accused to perform the functions which are essential to the fairness and accuracy of a criminal proceeding." This includes "present ability to consult with his lawyer with a reasonable degree of rational understanding," Dusky v. United States,

362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1962), and a reasonable ability to understand the proceedings and comprehend the effect of his actions upon them. Events during the trial cast serious doubt on appellant's "ability to consult with his lawyer." If, as the judge apparently thought, appellant's brash request to enter a guilty plea at the conclusion of his defense was not to be taken seriously, it was a warning of incompetence.

■ Recognizing the question to be close on these facts, we nonetheless conclude that the judge should have responded in some way to appellant's erratic behavior.[4] Although a judge has wide discretion in matters respecting competence, as we held in *Whalem,* he should recognize factors pertinent to its exercise. Here, the judge allowed the trial to proceed without even an intimation that a problem was presented.

■■ We are faced with the question of a remedy. Reversal of the conviction would be the normal course. Inquiry into a defendant's mental condition in the distant past is necessarily difficult and should usually be avoided. Dusky v. United States, *supra;* Wider v. United States, 120 U.S.App.D.C. ——, 348 F.2d 358 (1965). But an appellate court may "remand the cause and * * * require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. Appellant's sentence will soon be served. It would not be just to subject him unnecessarily to the risk of another trial and another sentence. Justice will be better served, in our opinion, by remanding the case for a mental examination and a *nunc pro tunc* hearing. The trial transcript will enable court and counsel to refresh their recollections of appellant's

---

3. The immediately ensuing proceedings were as follows:

MR. RENNE [Assistant United States Attorney]: Your Honor, I think questions should be directed to him, not a statement.

THE COURT: You heard what he said.

MR. RENNE: I heard what he said.

THE COURT: Very well.

MR. SMITH: The defense rests, Your Honor.

THE COURT: Very well.

4. This could have been done without serious delay or prejudice, *e.g.,* by recessing the trial overnight and asking the Hospital or the Legal Psychiatric Service for a prompt report.

demeanor and what took place at the trial. The presence of two St. Elizabeths staff members during some of the disturbing events may facilitate inquiry. Probation officers who made a pre-sentence investigation and' prison officials who had appellant in custody may have useful testimony. If the court finds that appellant was competent during his trial, the conviction will stand, subject to the right to appeal from this finding. If the court finds that he was not competent during his trial, it should vacate the conviction and, provided he is found to be competent now, hold a new trial.

Remanded with directions.

BURGER, Circuit Judge (dissenting):

The majority remands for a *nunc pro tunc* finding on Pouncey's competency to stand trial despite his failure to assert incompetency either here or in the District Court and despite St. Elizabeths' finding and statutory certification of competency. The finding on remand will necessarily be based in large part on the trial transcript which we have before us. To me that transcript discloses no basis whatever for a remand since no reasonable reading could lead to any conclusion but competency to stand trial.

But the best answer to the majority position is the very lucid testimony of Pouncey himself. Accordingly, I set forth his account of the circumstances which gave rise to his trial:

Q Now, directing your attention to on or about July 23, 1963, do you recall being represented by a Mr. Rex K. Nelson, an attorney?

A Yes, I do.

Q Do you recall being called from the cell block or taken from the cell block by a United States Marshal and brought to the jury room in the rear of the Court?

A Yes, I do.

Q I want you to tell the Court and the ladies and gentlemen of the jury what transpired in the jury room on that date.

A Well, on the date, that July 23, I came up to the Court to talk to Mr. Rex Nelson, concerning a case or a motion I had in Court at the time.

I was taken from the cell block into the jury room. I went in, sat down, and begun to talk with Mr. Nelson. Mr. Nelson had told me that the best thing I should do was to withdraw my motion or either to let the Judge vacate my sentence and make a plea of guilty again. I told Mr. Nelson I would not do this because of the fact that I was not guilty, and now I had my chance to prove my innocence.

Later Mr. Nelson told me, well, he did not actually want the case, but he was assigned by the Court and he had to continue. So I told Mr. Nelson that if possible would he present a motion before the Court asking to withdraw from my case. He told me he would not.

I then became upset, and I stood up, I got my briefcase and my coat and hat and went to the Marshal and asked him to take me back to the cell block, I was through discussing my case with Mr. Nelson.

The Marshal explained to me that the Judge had a case in Court at that time and I would have to wait. I went back and sat down. I was so upset I wanted to walk around; so I stood up and I walked around the table about two or three times.

Later on I went to the Marshal again and asked him to take me back to the cell block. At this time I was speaking in a loud boisterous manner. The Marshal told me to calm myself and go sit down, and he would see what he could do.

I went back to the far end of the room. The Marshal went out and came back and told me that they hadn't finished in the courtroom yet. Then I picked up my briefcase and told him: Let's get out of here. He raised his hand as if to push me

back. So I took a step back. I raised my hand to push his hand out of the way.

Then the Marshal told me to calm my voice and sit down. I said, O. K. As I turned, the Marshal grabbed me around the neck. So he said: You want to be tough; you want to be bad.

I said: I will sit down. I said: And stop choking me.

He said: You one of these bad fellows.

I said: Will you please let me go.

He then put more pressure on the hold that he had, which is a choke hold.

I grabbed the Marshal's arm, and I tried to, you know, loosen the hold. He then threw me to the floor. Me. [*sic*] Nelson went out the door to call for more help. The Marshal came in; he grabbed one of my legs and kneeled down on it. It was hurting, so I kicked him off.

Later on, the rest of the Marshals came with the chains. So one of them hit me with the chain across my leg to hold my legs still; I was kicking; and they chained me and took me downstairs.

Q Now, Charles, did you have any intention of assaulting this Marshal at any time?

A No, I did not.

Q Did you have any intention of resisting him in any way?

A No, sir.

Q But you did want to get back to the cell block; you did not want to have any further conversations with your then attorney, Mr. Nelson?

A Yes, I did.

Q Now, let me ask you this, Charles: How long have you had a tendency or do you have a tendency to become highly upset and excited on certain occasions?

A Yes, I do.

Q And how long has that tendency persisted? How long have you had it?

A As far back as I can remember.

Q Do you think you need psychiatric treatment for this condition?

A Not to a great extent, but I do need help.

Tr. 67–70.

As the record shows, Pouncey has a history of not liking his appointed lawyers; he seems to want to run his own litigation. There may be cases of genuine incompetency to stand trial of which such a history may be symptomatic, but nothing in the present record suggests to me that Pouncey's condition is such a case. Indeed one manifestation of his distrust of counsel quite convincingly, I think, reveals just how "competent" Pouncey was in his own behalf. He assumed to cross-examine Dr. Owens, Clinical Director at St. Elizabeths, who had testified concerning the testing Pouncey had received at the hospital. In the following manner he questioned whether anyone had seen him except the man who administered his psychological tests:

THE DEFENDANT: Excuse me, Your Honor, I would like to ask Dr. Owens a couple of questions.

THE COURT: You may keep your seat.

MR. SMITH: If I may, I will confer with the Defendant, Your Honor, and see what questions he wants to ask, and I will propound them.

(Whereupon defense counsel conferred with the Defendant.)

MR. SMITH: If the Court please, the Defendant wants to ask his

own questions. He doesn't want to ask them through me.

THE COURT: Have him step up here. He may do so.

THE DEFENDANT: Dr. Owens, during the time I was over Saint Elizabeths Hospital, exactly how many times did I ever talk to any of the doctors over there or does your records show the amount of times that I had any conference or had been given any tests by any other doctor except Dr. Silberman?

THE WITNESS: Beginning with the date of January 15, 1964, the staff conference, you were examined for a period of approximately an hour to an hour and a half by Dr. Owens, Dr. Dobbs, Dr. Ross, Dr. Simco, Dr. McGeehan, Dr. Chyhandi, two psychologists, Miss Sheegan, Mr. Wilberman, and Miss Pink, the social worker was also present.

Tr. 148–149. In my view Pouncey's conduct here forecloses the remand now ordered by the court on a ground never sought by the Appellant.

The majority's action is further objectionable. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1962), often requires a new trial preceded by a determination of present competency because of the asserted difficulty of determining the issue of former competency retrospectively; the majority nonetheless orders a *nunc pro tunc* determination here. It may be that this would be the proper remand here if any remand were proper at all,[1] but I question the majority's rationale for this disposition. They say, "It would not be just to subject him [Pouncey] unnecessarily to the risk of another trial and another sentence," merely because of the fortuity that his sentence will soon have been served. It seems to me that the

risk that an appeal will be successful, resulting in a remand for a new trial, is one which must be borne by one who invokes the processes of an appellate court in order to secure a new trial.

---

1. All of the discussion as to the difficulty of determining trial competency *nunc pro tunc* seems to ignore generations of experience in will contest cases. In such cases the courts deal with testamentary capacity which is far more elusive and subtle an issue to resolve and often must make the determination as of a date many years before the trial of the question.