Commonwealth *v.* Bruno, Appellant.

Argued January 11, 1968; reargued May 1, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Daniel L. Quinlan, Jr.,* for appellant.

*Richard A. Devlin,* Assistant District Attorney, with him *Milton O. Moss,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, June 27, 1969:

These appeals are from an order of the Court of Oyer and Terminer and General Jail Delivery of Montgomery County committing the appellant, John Harry Bruno, to Farview State Hospital and from an order of the Court of Common Pleas of Montgomery County dismissing appellant's petition for a writ of habeas corpus.

Bruno was arrested on April 26, 1966, and was arraigned the following day on five charges of murder. On May 4, 1966, a preliminary hearing was held at which Bruno entered a plea of not guilty. On June 2, 1966, a grand jury indicted Bruno on five charges of murder.

Meanwhile, on May 13, 1966, the Montgomery County district attorney filed a petition for the appointment of a commission to inquire into Bruno's sanity.

Bruno's counsel filed a motion to dismiss the petition. After argument, the court, on July 6, 1966, denied the motion to dismiss and entered an order appointing a sanity commission. An appeal to this Court followed and was quashed. *Commonwealth v. Bruno,* 424 Pa. 96, 225 A. 2d 241 (1967).

Thereafter the sanity commission held extensive hearings. On June 8, 1967, it submitted its report to the Court of Oyer and Terminer of Montgomery County. The report concludes that Bruno is mentally ill and incompetent to stand trial and that he has criminal tendencies.

On June 12, 1967, the court entered an order committing Bruno to Farview State Hospital, but deferred the execution of the order until June 28, 1967, so that Bruno, his counsel or relatives might request a hearing. Thereupon Bruno's attorney excepted to the sanity commission's report on the ground that the record does not support the commission's conclusions and contains hearsay evidence. On June 30, 1967, the Commonwealth's motion to strike the exceptions was sustained on the ground that *Commonwealth v. Ballem,* 391 Pa. 626, 139 A. 2d 534 (1958), disapproves the exception procedure. On the same day the court directed the commitment of Bruno pursuant to its order of June 12, 1967.

Thereafter, Bruno filed a petition for a writ of habeas corpus in the Court of Common Pleas of Montgomery County. The petition was dismissed without hearing on the ground that the commitment order was appealable and no useful purpose would be served by a hearing.

These appeals followed.

Appellant's statement of the first question presented to this Court is: "May a sanity commission be substituted for a jury trial?" He contends that: "The substitution of a sanity commission [for a jury trial] vio-

lates appellant's constitutional right to a jury trial as guaranteed by the Sixth Amendment [to the United States Constitution] and [by] Article I, §9 [and §6] of the Pennsylvania Constitution."

To support his contention that a sanity commission has been "substituted" for a jury trial, appellant asserts that his commitment to an institution for the criminally insane is a "sentence" as severe as if he were convicted of the crime with which he is charged.

We cannot agree that a commitment to an institution for the criminally insane is tantamount to a prison sentence. Although Farview State Hospital certainly is not a model institution, see Note, 110 U. Pa. L. Rev. 78 (1961), we are not prepared to say that it is equivalent to a prison. Punitive confinement in a prison is not the same as custodial supervision in a hospital. Rehabilitative programs in a prison are not the same as psychiatric treatment in a hospital. In addition to the fact that the consequences of a commitment to a hospital are not the same as the consequences of a prison sentence, a proceeding determining competency to stand trial is not a "substitute" for a trial determining guilt or innocence of a criminal charge because the two proceedings clearly determine different issues.

Appellant cites *Pate v. Robinson,* 383 U.S. 375, 86 S. Ct. 836 (1966), apparently to support his contention that he is constitutionally entitled to a jury trial. *Pate v. Robinson,* however, held only that due process requires a *hearing* on the *competency of an accused to stand trial* when the circumstances at trial raised a doubt about his competency. Certainly the decision in *Pate v. Robinson* did not require a *trial* on the issue of the accused's guilt or innocence—the accused had already been tried and convicted. Neither did the decision in *Pate v. Robinson* require that a *jury* determine whether the accused was competent to stand trial.

Although the opinion does note in passing that the law of the state which tried and convicted the accused provides for a jury to determine the issue of competency to stand trial, there is no suggestion that due process requires a jury. All the authority which our research has uncovered indicates that the Sixth Amendment does not require that a jury determine the competency of the accused to stand trial. *United States v. Davis,* 365 F. 2d 251, 256 (6th Cir. 1966), and authorities cited therein. If the Sixth Amendment does not require a jury, certainly the due process clause of the Fourteenth Amendment does not require it. We have also determined that Pennsylvania Constitution, Article I, §§6 and 9, does not require a jury trial on this issue. *Commonwealth v. Bechtel,* 384 Pa. 184, 120 A. 2d 295 (1956).

Appellant also submits that his commitment to Farview State Hospital for an indefinite period violates his constitutional right to a "speedy trial."[1] All the authorities our research has uncovered indicate that the federal constitutional guarantee of a speedy criminal trial does not require that an incompetent accused be tried. E.g., *United States ex rel. Thomas v. Pate,* 351 F. 2d 910 (7th Cir. 1965), cert. denied, 383 U.S. 962, 86 S. Ct. 1232 (1966); *Howard v. United States,*

---

[1] He does not argue that he should be given a jury trial before a determination on his competency even if the United States and Pennsylvania Constitutions do not so require. See generally, C. Foote, Pre-Trial Commitment of Criminal Defendants, 108 U. Pa. L. Rev. 832 (1960). Since the question has not been briefed or argued, we express no opinion on whether or not the institution of such a procedure would be desirable and consistent with the legislation controlling the determination of competency and within our power. But, it would appear to us that placing a man on trial while he was incompetent and mentally ill would be a violation of his constitutional right of due process. Certainly, the mental competence of an accused must be regarded as an absolute and basic condition of a fair trial.

261 F. 2d 729 (5th Cir. 1958); *United States v. Miller,* 131 F. Supp. 88 (D. Vt. 1955); *State v. Violett,* 111 N.W. 2d 598 (S.D. 1961). Appellant offers no argument which would lead us to interpret the state constitution differently.

Appellant's statement of the second question presented to this Court is: "May a sanity commission consider 'hearsay' confidential medical records and listen to testimony violative of Miranda v. Arizona (384 U.S. 436) and Escobedo v. Illinois (378 U.S. 478)?" He contends that: "The sanity commission's report should have been rejected" because of the alleged errors.

We cannot agree that the sanity commission's inquiry should be restricted as appellant contends.

We have repeatedly said that a sanity commission hearing is not criminal in character. It does not determine whether or not the accused shall be punished. It merely determines, as much for the benefit of the accused as for the benefit of the public, whether or not his mental condition is such that he shall not be tried; and its determination is solely to inform and advise the judge who himself decides whether or not the accused is competent to stand trial and, if he is not, whether or not he should be committed to a hospital pending his recovery. E.g., *Commonwealth v. Ballem,* supra; *Commonwealth v. Bechtel,* supra; *Commonwealth ex rel. Tate v. Shovlin,* 205 Pa. Superior Ct. 370, 208 A. 2d 924 (1965).

Given the fact that the sanity commission hearing is not a criminal proceeding, we think that neither the hearsay rule, to the extent that it is mandated by the constitutional right to confrontation, nor *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), are applicable.

Both the decision in *Miranda v. Arizona* and the right to confrontation derive from constitutional pro-

visions which apply only to criminal proceedings. Thus the United States Constitution provides: "nor shall [any person] be compelled *in any criminal case* to be a witness against himself." Amend. 5 (Emphasis added.) "In all *criminal prosecutions* the accused shall enjoy the right . . . to be confronted with witnesses against him . . . and to have the assistance of counsel for his defense." Amend. 6 (Emphasis added.) Equivalent provisions of the Pennsylvania Constitution also are limited to criminal prosecutions: "In all *criminal prosecutions* the accused hath a right to be heard by himself and his counsel . . . to meet the witnesses face to face . . . he cannot be compelled to give evidence against himself." Article I, §9 (Emphasis added.)

*Miranda v. Arizona* extended the right against self-incrimination and the right to the assistance of counsel from the formal "criminal proceeding," i.e., the trial, to police interrogation. For similar reasons, we long ago indicated that the right against self-incrimination protects a person from being compelled to answer any question propounded to him by those making a mental examination "for the purpose of testifying in regard thereto" at a criminal trial. *Commonwealth v. Musto,* 348 Pa. 300, 306, 35 A. 2d 307, 311 (1944). Both *Miranda* and *Musto* simply recognize that the guilt determining process does not begin at trial. The same considerations, however, do not compel us to extend the boundaries of "criminal prosecutions" to include sanity commission hearings which focus on an issue other than the accused's guilt or innocence.

Of course, the constitutional rights which expressly exist in criminal proceedings may also be inherent in the constitutional provisions that "no person shall be deprived of life, liberty or property without due process of law," which obviously applies in noncriminal as well as in criminal proceedings. We do not believe,

however, that due process requires the evidentiary restrictions advocated by the appellant. Such restrictions would unnecessarily impede a diagnosis of an accused's mental condition which would be a detriment to the accused as frequently as it would be a detriment to the prosecution. We believe that due process does not mandate these impediments when the purpose of the proceeding is to determine not whether to punish the accused by depriving him of liberty, but whether to help him by providing psychiatric treatment and custodial supervision for his own protection, as well as for the protection of the public.

We consider only the issues raised by the appellant's statement of questions, briefed and argued before the Court. We express no opinion on any other issues which may be posed by the proceedings below.

Orders affirmed.

Mr. Chief Justice BELL, Mr. Justice JONES and Mr. Justice POMEROY join in this opinion.

———

CONCURRING OPINION BY MR. JUSTICE POMEROY:

While I subscribe to the opinion of Mr. Justice EAGEN, speaking for the Court, I feel constrained, in light of the dissenting opinions, to mention additional considerations which have led me to this conclusion. The division of opinion relative to this appeal is not because of a conflict, or supposed conflict, between the rights of the accused on the one hand and the rights of society on the other, but because of disagreement concerning the interaction of two rights of the accused individual; the right to a fair trial, on the one hand, and the right to a speedy trial on the other, both of which are guaranteed by both the Federal Constitution and the Constitution of Pennsylvania.

In this case the Sanity Commission, duly established under The Mental Health Act of 1951, Act of June 12, 1951, P. L. 533, Art. III, §327, as amended, 50 P.S. §1202, and composed of two qualified psychiatrists and a competent lawyer, filed its report, consisting of 16 typewritten pages, concluding that the defendant is mentally ill as defined in The Mental Health Act, incompetent to stand trial, and of criminal tendency stemming from his mental illness. More specifically, the Commission was of the opinion that the defendant "is now and has been in the past suffering from chronic paranoid schizophrenia which has existed for a number of years", and that his criminal tendency stems from his mental illness, "as shown by his belief that only by eliminating suspected people can he and his family be protected . . . [I]f no relief is forthcoming after the elimination of certain suspected persons he will have to seek other suspects." The report concluded with the finding that the defendant "does not have a sufficient present ability to consult with his counsel with a reasonable degree of rational understanding, nor does he have a rational and factual understanding of the proceedings flowing from the criminal charges lodged against him."

The findings of the Commission were adopted by the Court.

By the petition for a writ of habeas corpus, in which it is claimed that the order of commitment based on this report constitutes a violation of defendant's right to a jury trial and that he is being unconstitutionally deprived of his liberty, the lower court is asked, in effect, to ignore the report of the Commission and its own findings based thereon, revoke the commitment order, and proceed to the trial of the defendant for murder. One can imagine the charges of violation of due process that would be made if this petition were granted and a conviction resulted.

The appellant cites the statement of the Supreme Court of the United States in *Pate v. Robinson,* 383 U.S. 375, 15 L. Ed. 2d 815 (1966), to the effect that Robinson was "constitutionally entitled to a hearing on the issue of his competency to stand trial." This is true, of course, and was adhered to in the present case. In the *Pate* opinion, the Court further said, citing *Bishop v. United States,* 350 U.S. 961, 100 L. Ed. 835 (1956), "The State concedes that the conviction of an accused person while he is legally incompetent violates due process, and that state procedures must be adequate to protect this right."

The dissenting opinions, however, point out that in this case the defendant wants his trial and cannot be said to have waived it; the Sanity Commission was the State's doing, not his. If the Sanity Commission is correct in stating that the defendant is without ability to consult with his counsel with a reasonable degree of rational understanding, it is difficult to conclude that defendant can intelligently advise counsel with rational understanding that he desires to be tried. We note, in passing, that it was the lawyer and not the defendant who verified the petition for the writ of habeas corpus. There is a danger, it seems to me, of confusing zealous and able counsel with the client in a case of this sort.

It is said, again, that the incarceration in Farview Hospital is but a substitute for imprisonment following conviction, and might postpone appellant's trial indefinitely. This overlooks, it seems to me, two important points. The first, that the right to a speedy trial, like all other rights, is not absolute and automatic; it means speedy under the circumstances. As the Supreme Court of the United States has well stated, " 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends on circum-

stances.  It secures rights to a defendant.  It does not preclude the rights of public justice.'  Again, 'Whether delay in completing a prosecution . . . amounts to an unconstitutional deprivation of rights depends upon the circumstances . . . The delay must not be purposeful or oppressive.'  '[T]he essential ingredient is orderly expedition, and not mere speed.'" *United States v. Ewell,* 383 U.S. 116, 120, 15 L. Ed. 2d 627, 630 (1966), as quoted in *Hodges v. United States,* 408 F. 2d 543, 549 (8th Cir. 1969).

The *Hodges* case involved a delay due to pretrial commitment for determination of competency.  The result of psychiatric examination was that the defendant was competent.  Following the *Ewell* guidelines, the 8th Circuit Court of Appeals, on appeal from a conviction of counterfeiting, held that the Sixth Amendment's guarantee of a speedy trial had not been violated.  The Court paid particular attention to the first safeguard, "to prevent undue and oppressive incarceration prior to trial", and held that under the circumstances, the four months of incarceration involved in *Hodges* because of the incompetency issue was not "undue and oppressive".  The Circuit Court singled out the third safeguard, viz., "to limit the possibilities that long delay will impair the ability of an accused to defend himself", as most important.  This is properly of concern to the dissenting justices here, but of no less concern to the majority.

A second important point ignored by the dissents is that the Mental Health and Mental Retardation Act of 1966, Act of October 20, 1966, Spec. Sess. No. 3, P. L. 96, §423, 50 P.S. §4423(7), provides a statutory procedure expressly designed to insure that a trial will not be delayed because of unwarranted detention.[1]  This sec-

---

[1] This Act became effective January 1, 1967, repealing all inconsistent provisions of The Mental Health Act of 1951.  As of

tion provides that after the findings of the Sanity Commission, the committed person has the right to request that the Department of Public Welfare arrange for examination of his mental condition by a physician not associated with the Department. This request must be granted by the Department for the first time after six months' hospitalization, and can be demanded as often as once a year thereafter. Moreover, any committed person may petition for a writ of habeas corpus on the affidavit of a physician that in his opinion the person is no longer mentally disabled, or that his mental disability does not require care or treatment in a hospital facility, and in such proceeding the burden of proof rests upon the director responsible for the continued detention of the accused. *Ibid*, §426, 50 P.S. §4426(b)(2). Thus, in this case, Bruno has a readily available procedure, for he may, periodically and frequently, have a recheck of his mental competence to stand trial. He is not indefinitely confined without any recourse.

Mr. Justice ROBERTS notes, in his dissent, that under the Mental Health and Mental Retardation Act of 1966, a person in appellant's position must post bail if directed by the Court, in order to receive out-patient care, and argues that this fact labels the proceeding as criminal. There is no question, of course, that commitment under these circumstances is an adjunct to a criminal proceeding; therefore, the requirement that the accused post bail before being allowed to leave State custody is appropriate. He would have to do the same if there were no question about his mental competence and he wished to secure pretrial freedom. Being out on bail, whether or not committed for incompetency, has no bearing on the issue of guilt.

July 1, 1969, the latter Act was repealed absolutely. 50 P.S. §4701(a). Similar provisions as to release were contained in The Mental Health Act of 1951, as amended, *supra*. See *Com. ex rel. Wolenski v. Shovlin*, 419 Pa. 35, 213 A. 2d 327 (1965).

It may well be that society has not yet reached the right answer in the handling of persons who are both criminally accused and found to be mentally incompetent, and to have criminal tendencies. Better methods may, and perhaps need to be, devised to accommodate the competing claims of fair trial and speedy trial in these situations. It does not follow, however, that a person in such an unfortunate position should be able to demand, on the one hand, a *speedy* trial and if his request is granted and conviction results, to charge, on the other hand, that he was denied a *fair* trial because he was tried when he was incompetent to defend himself. If there is to be fairness, there cannot be speed, in any absolute sense; if a trial is to be speedy, in an absolute sense, it will not be fair. The statutes of Pennsylvania, and the lower court in acting upon them, have endeavored to protect both rights of the defendant. This process, like any other, may be subject to abuse, but such abuse is not disclosed by the record before the Court in this case. The suggestions of malevolent motivation on the part of the Commonwealth are not justified.

Mr. Chief Justice BELL and Mr. Justice JONES join in this opinion.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

When an accused is adjudged incompetent a procedure should be established whereby the incompetent defendant might demand a speedy trial as required by both Federal and State Constitutions.

I recognize that this may require the appointment of a guardian to act on behalf of the incompetent defendant and the establishment of procedures so that the decision to stand trial can be made intelligently, either by the incompetent defendant or some one acting on his behalf. The Commonwealth, when proper-

ly requested, should not be permitted to refuse to proceed with trial because of a defendant's incompetency and thereby deny defendant a right that is constitutionally guaranteed.

Just as in *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), where it was indicated that the juvenile "receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children"; so, the incompetent receives neither the constitutional protections due him nor proper confinement. I would use this litigation as a vehicle to enunciate the constitutional rights of incompetent defendants.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

The majority opinion represents a resolution of the instant case that is abhorrent to fundamental notions of due process. Although at all times strenuously maintaining his innocence, appellant has been incarcerated in Farview State Hospital, an institution for the criminally insane, without being tried and convicted of a crime. Delineation of the institution as a hospital does nothing to remove the stigma of its housing only the "criminally insane", nor does it insure that the adequate treatment is taking place which alone can transform a Hades of punishment into a haven for the sick.[1] In fact, it appears that it is a rare "patient"

---

[1] See generally, Birnbaum, *The Right to Treatment*, 46 A.B.A.J. 499 (1960). See also *Rouse v. Cameron*, 373 F. 2d 451 (D.C. Cir. 1966); *Darnell v. Cameron*, 348 F. 2d 64 (D.C. Cir. 1965); *Miller v. Overholser*, 206 F. 2d 415 (D.C. Cir. 1953), where the court ordered a civilly committed sexual psychopath removed from a hospital ward for the criminally insane because the ward was a place of punishment rather than of treatment.

at Farview who receives the treatment he needs. One thoroughgoing study of that institution concludes, "It is difficult to deny that the type of psychiatric treatment available at Farview State Hospital, as well as that actually given, is inadequate. Patients at Farview are fed, clothed, cared for, and amused; but few of them are treated."[2]

Yet even if appellant were not tainted by his confinement in an institution for the *criminally* insane, even if he were being given the best possible treatment in an actual hospital, he would still be denied the due process of law guaranteed by the Constitutions of this nation and this Commonwealth. The guarantee of a speedy trial was inserted into our Constitutions[3] both to afford an accused the opportunity to remove the cloud cast upon his name by an accusation, and also to prevent the loss of potentially exculpatory evidence. Both of these reasons apply to the case at bar.

Without any attempt to reason from the principles inherent in a right to a speedy trial, the majority simply asserts that the guarantee of a speedy trial does not require that an incompetent accused be tried, citing in this case of first impression in Pennsylvania four cases (only one appellate case) interpreting the federal guarantee. Although I agree with the majority that the guarantees in the federal and state constitutions are the same, I see no reason to accept blindly the language of the cases cited by the majority. In

---

In *Com. v. Williams*, 432 Pa. 44, 246 A. 2d 356 (1968), we held that treatment was not essential because Jones was incarcerated in a penal institution. Where, as here, appellant was confined in a hospital, treatment is certainly required.

[2] Note: *Hospitalization of Mentally Ill Criminals*, 110 U. Pa. L. Rev. 78, 107 (1961).

[3] Article I, §9 of the Pennsylvania Constitution, and the Sixth Amendment to the United States Constitution, where federal trials are involved.

none of these cases does it appear that the instant factual situation was thoroughly considered. *Howard v. U. S.*, 261 F. 2d 729 (5th Cir. 1958), was a two-paragraph *per curiam* opinion. It relied solely upon the fact that the constitutionality of the federal statute, 18 U.S.C.A. §§4244-4248, providing for the commitment of those found to be incompetent to stand trial and dangerous, had been upheld in *Greenwood v. United States*, 350 U.S. 366, 76 S. Ct. 410 (1956). Yet the issue of the denial of a right to a speedy trial was never raised nor decided in *Greenwood*. The issue was solely a jurisdictional one—whether the application of the statute to defendants who were "permanently" insane or unlikely to recover was an unconstitutional exercise of federal power, the federal government being without the *parens patriae* power over the insane that the states have. The Court in *Greenwood*, unable to conclude from the psychiatric evidence that Greenwood's insanity was permanent, grounded the federal commitment on the federal authority to prosecute for federal crimes. Nowhere was the speedy trial problem considered. Similarly, the court in *United States v. Miller*, 131 F. Supp. 88 (D. Vt. 1955), also cited by the majority, based its decision largely on the fact that two United States Courts of Appeals had upheld the constitutionality of the federal statute.[4] Once again, however, the attacks on the statute were not on the basis of a denial of a speedy trial, but rather on the jurisdictional question which *Greenwood* eventually resolved.

In *State v. Violett*, 111 N.W. 2d 598 (S.D. 1961), a third case relied upon by the majority, the main basis for the decision was that the defendant had waived his right to a speedy trial by not asking for it and acquiescing in the incompetency proceeding. By

---

[4] *Wells v. Attorney General*, 201 F. 2d 556 (10th Cir. 1953); *Higgins v. United States*, 205 F. 2d 650 (9th Cir. 1953).

contrast, in the instant case, appellant objected to the appointment of a sanity commission and has at all times desired to be tried. The waiver theory also appears to be the basis of the final case cited by the majority, *United States ex rel. Thomas v. Pate*, 351 F. 2d 910 (7th Cir. 1965), cert. denied, 383 U.S. 962, 86 S. Ct. 1232 (1966).[5]

The above should not be considered any sort of an endorsement of the waiver theory. On the contrary, I believe that any procedure which requires a defendant, (or more likely, his counsel), to choose between incompetency proceedings and a trial violates due process.[6] Here, however, appellant did not elect an incompetency proceeding and then seek release for violation of his right to a speedy trial. Nor did he even acquiesce in the incompetency proceeding brought by the District Attorney. Appellant has maintained his innocence throughout and has at all times pressed for a trial. It is no answer to say, as the court did in *United States v. Miller*, supra, that where a defendant does not have the mental capacity properly to assist in his own defense, *a fortiori* he does not have the capacity to decide that he wants to stand trial.[7] Such

---

[5] Actually, the statement that there was no violation of the constitutional right to a speedy trial was at most an alternative holding. The court held that the grounds advanced has been advanced in a prior petition that had been decided on the merits, and thus could not be considered. Nonetheless, it then went on and did consider the speedy trial issue in one brief paragraph. The only citation was to *Germany v. Hudspeth*, 209 F. 2d 15, 19 (10th Cir. 1954), cert. denied, 347 U.S. 946, 74 S. Ct. 644 (1954), the clearest possible case of waiver, where defendant himself initiated the incompetency proceedings.

[6] See the very excellent Comment by Caleb Foote, *Pre-Trial Commitment of Criminal Defendants*, 108 U. Pa. L. Rev. 832, 845-6 (1960).

[7] In *Pate v. Robinson*, 383 U.S. 381, 384, 86 S. Ct. 836 (1966), the Court stated: ". . . [I]t is contradictory to argue that a de-

a view ignores several factors. First, although a defendant who is incompetent to stand trial may not be able to determine wherein lies his best course, his counsel does not suffer the same infirmity. And if the defendant refuses counsel, the court can appoint an *amicus curiae* to represent the defendant's interests.[8] Secondly, such a view presumes that it is always in the best interests of the defendant[9] that he be committed if mentally incompetent.[10] Of course this is not true, nor would it be even if defendant were guilty of the crime charged. The choice between a prison term and a possibly lifelong stay in an institution for the

fendant may be incompetent, and yet knowingly and intelligently 'waive' his right to have the court determine his capacity to stand trial." I read this not as support for the *Miller* view that an incompetent defendant can never go to trial, but as merely saying that his going to trial does not preclude his later raising the incompetency issue.

[8] This suggestion was made in *Seidner v. United States*, 260 F. 2d 732 (D.C. Cir. 1958), where the court anticipated that the defendant would refuse counsel on remand. See also Foote, *Pre-Trial Commitment*, supra, at page 845; Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454, 467 (1967).

[9] The commitment of all defendants incompetent to stand trial is not necessarily in society's interests either, even if society should be permitted to work its will at the expense of trampling upon the rights of this unfortunate minority. The statute under which appellant was committed, the Act of June 12, 1951, P. L. 533, Art. III, §§344, 345, 50 P.S. §§1224, 1225, as well as another parallel section of the same Act, 50 P.S. §1222, requires no showing of dangerousness as a prerequisite for commitment. It is enough that the defendant be "mentally ill or in such condition that he requires care in a mental hospital." Sending nondangerous persons to institutions for the criminally insane hardly redounds to society's benefit.

[10] The *Miller* Court stated, 131 F. Supp. at 94-95: "The sound basic policy of Sections 4244 and 4246 of the United States Code is to protect people from facing charges against them when they are not mentally present."

criminally insane is by no means always resolved in favor of the latter.[11]

Most importantly, the *Miller* view works a grave injustice in those instances where the defendant is not guilty of the crime charged. He is sent to an institution for the criminally insane, he has the sword of indictment hanging over his head the entire time, and the means of proving his innocence may be irretrievably lost. Prosecution evidence may also be lost, but this is considerably less likely, for the prosecution is much more likely to have facilities for gathering and preserving evidence than is a committed person. In any event, the fact that the prosecution may in some cases be prejudiced in no way assures each particular defendant against prejudice. Certainly cases exist where an incompetent defendant, despite his incompetence, would not be convicted. One of the most flagrant examples is *United States v. Barnes,* 175 F. Supp. 60 (S.D. Cal. 1959). The facts in that case were summarized in Foote, *Pre-Trial Commitment,* supra, at page 832: "In 1949 four military prisoners killed a fellow prisoner in a California disciplinary barracks and were convicted of murder by a military court martial. Ten years later the Supreme Court sustained the defendants' contention under section 92 of the Articles of War that the military court had had no jurisdiction over a case of murder committed within the continental United States in time of peace. [footnote omitted] Thereafter on March 4, 1959, defendants were indicted in the civil federal district court. As to three of the defendants, the court, relying principally upon United States v. Provoo, [17 F.R.D. 183 (D. Md.) aff'd per curiam, 350 U.S. 857 (1955).] granted a motion to dismiss on the ground that the ten-year delay, occa-

---

[11] See authorities cited in Note, *Incompetency to Stand Trial,* supra, at n.16.

sioned not through the fault of the defendants but as a result of a calculated tactical gambit by the government, had amounted to denial of the right to a speedy trial. However, the indictment against the fourth defendant, Coons, was not dismissed; he was recommitted to the custody of the Attorney General. Coons had been brought to court from Springfield, Missouri, where he had been serving his military life sentence in the federal institution for the criminally insane. This fact together with his conduct in court caused the judge to order a psychiatric examination pursuant to the 1949 federal statute governing determination of mental competence to stand trial. [footnote omitted] After examination and hearing, Coons was found to be 'presently insane and so mentally incompetent as to be unable to understand the proceedings against him,' and he was returned to Springfield until, presumably, he should be sufficiently recovered to 'participate' in the dismissal of the indictment against him." Here is a man, obviously not convictable, who, as Foote laments, is forced to submit to a commitment procedure which is part of the criminal process and which will result in confinement with the criminally insane. No finding of dangerousness was made in *Barnes*, nor, as pointed out above, in footnote 9, is such a finding required in Pennsylvania. There are even worse cases than this. Barnes' defense was based solely on a point of law; if he ever recovered his sanity, he would be freed if tried. But what of the defendant who has an affirmative defense that depends on witnesses who may not be available or who may not remember when he is finally tried?

Such a pretrial commitment procedure poses grave danger of furthering what our entire system of constitutional safeguards seeks to prevent—the loss of freedom of an innocent, nondangerous person. This machinery, in the hands of the most conscientious pub-

lic official, which we have every right to assume the Montgomery County District Attorney is, casts doubt upon the efficacy of our judicial system. In the hands of the unscrupulous, this procedure could prove to be a terrible instrument for tyranny. It is one of the glories of our system of government that our institutions are greater than the men who run them. We should strive to keep it that way, so that our well-being need not hinge upon the beneficence of those we choose to serve us. We must always remain *"non sub homine, sed sub deo et lege."*

Finally, the view that says that an incompetent defendant cannot choose whether to stand trial or not is defective in assuming that by going to trial, a defendant would forego any opportunity to challenge his competency to stand trial. At least one common law court has held that the determination of the defendant's competency must be deferred until after the trial on the merits, where the defense wishes to go to trial on the merits.[12] In *Regina v. Roberts,* [1953] 2 All E. R. 340

---

[12] Of course, where the competency issue may be deferred until after a trial on the merits, there would be little to restrain a defendant from always seeking a trial on the merits. It is doubtful that this would add much burden to the judicial system, by requiring some trials in which a guilty verdict would be of no effect. Although statistics are sketchy, it appears that cases where defendants are held incompetent to stand trial are rare, and in many of those, defendant's insanity at the time he committed the crime would be a defense on the merits.

Counterbalancing any added burden would be the probable aid to the determination of competency from the evidence of the defendant's actual conduct at trial. See *Pouncey v. United States,* 349 F. 2d 699 (D.C. Cir. 1965), and Note, *Incompetency to Stand Trial,* supra, at page 469. The competency hearing should follow closely upon the heels of the trial, and could include reports of pre-trial psychiatric examinations of the defendant in order to avoid the problems of an inquiry into a defendant's mental condition in the distant past, as illustrated by *Dusky v. United States,* 362 U.S. 402, 80 S. Ct. 788 (1960).

[1954] 2 Q.B. 329, the court, DEVLIN, J., postponed swearing a jury to try the preliminary issue of competency to stand trial (fitness to plead) until the merits were tried. DEVLIN, J., cogently stated: "Counsel for the defense cannot be forced to accept [an institution for the criminally insane] for his client, if on a true view of the facts, he is of the opinion that he can properly obtain for his client a verdict of not guilty. Nor can he be forced to elect. He must be entitled to retain his rights to say that the accused is not in a position to instruct him and therefore he cannot put the accused in the witness-box to tell his own story. He cannot be forced to say to himself: 'Shall I play for safety and obtain a verdict whereby this man is detained as a criminal lunatic, or shall I, in effect, gamble on the chance of my being able to get him off altogether with the knowledge that if my gamble fails he will be convicted of murder.' . . . There must, in my view, be a procedure which would enable counsel for the defense to have the advantage of taking both points, and if there were no such procedure I think it would be necessary to invent it, because to insist on the issue of fitness to plead being tried [first] might result in the grave injustice of detaining as a criminal lunatic a man who was quite innocent; indeed, it might result in the public mischief that a person so detained would be assumed, in the eyes of the police and of the authorities, to have been the person responsible for the crime—whether he was or was not—and investigations which might have led to the apprehension of the true criminal would not take place." [13]

In any event, the question of added burden on the courts is irrelevant to a decision based on a denial of due process.

[13] [1954] 2 Q.B. 329, 332-33.

When the same issue later arose before a different judge, BYRNE, J., on the Queens Bench, he refused to allow a trial on

I would allow the appellant his constitutional right to a speedy trial.

___

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I am compelled to dissent from the majority's determination that evidence which would be inadmissible against appellant at a trial by virtue of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), and *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758 (1964), can nonetheless be used in a proceeding the result of which is to institutionalize appellant against his will because he is "incompetent to stand trial." I also believe that the Commonwealth cannot force a competency hearing on an accused who wishes to go to trial.

Although in general a claim of incompetency to stand trial will come from an accused, here it must be remembered that appellant has continued to resist the Commonwealth's efforts to not try him. His psychiatric condition has been raised, not by him, but by the Commonwealth. Cf. *State v. Obstein,* 52 N.J. 516 (1968). As a result, the Commonwealth now claims that it can use evidence to deprive appellant of his freedom through commitment that could not be used to deprive him of his liberty at a trial on the merits of the case. It should be quite clear then that the majority's statement that "the evidentiary restrictions advocated by the appellant . . . would unnecessarily impede a diagnosis . . . which would be of detriment to the accused as frequently as it would be a detriment to the prosecution" is illogical. Appellant

___

the merits, *R. v. Beynon,* [1957] 2 All E.R. 513 (Cardiff Ass.), merely relying on a long line of authority to the effect that an insane man, who cannot defend himself, should not be forced to trial. Of course, as the commentators indicate, this misses the point. See Foote, *Pre-Trial Commitment,* supra, and Note, *Incompetency to Stand Trial,* supra.

here does not *want* an adjudication of his competency. If he did, he would suffer no detriment, for he would not raise any *Miranda* or *Escobedo* claims to prevent the use of evidence which *he* wanted to introduce and would not object to the Commonwealth's use of such evidence in the unlikely event that it was favorable to him.

In the main, the majority rejects appellant's claim because it finds that the competency hearing is not a "criminal proceeding." I would have thought that *Application of Gault,* 387 U.S. 1, 87 S. Ct. 1428 (1967), would have put to rest once and for all the simplistic notion that deprivation of constitutionally proscribed rights could be achieved by labelling, or rather mislabelling, a proceeding as "non-criminal," but the majority here proves that the ghost still walks the land. In *Gault,* of course, the Supreme Court of the United States held that the characterization of juvenile proceedings as being aimed only at the child's best interests was insufficient to overcome the realities of the situation. An examination of the institution involved here reveals a striking similarity between it and the institution which *Gault* held could not be considered noncriminal for constitutional purposes.

The Court in *Gault,* quoting the dissenting opinion of Mr. Justice MUSMANNO in *Holmes' Appeal,* 379 Pa. 599, 616, 109 A. 2d 523, 530 (1954), stated that the juvenile is placed in "a building with whitewashed walls, regimented routine and institutional hours. . . ." 387 U.S. at 27, 87 S. Ct. at 1443. We need not argue with the majority's determination that Farview, where appellant was sent, is not "equivalent to a prison" to find that it is close enough to be as objectionable as the institutions involved in *Gault* and *Holmes.* Staff members at Farview not only have recognized that "bars, guards, and routine" are a significant part of

the atmosphere of the institution; they have claimed that these factors are helpful in rehabilitation! 110 U. Pa. L. Rev. 78, 86 (1961).

The Supreme Court in *Gault* did not require as does the majority here that the institution to which juveniles were sent be "tantamount to a prison sentence." It was sufficient that the institution had the characteristics that are present at Farview. Once this was the case, constitutional guarantees attached just as if there had been the usual trial.

Even apart from *Gault*, it is sheer fantasy to suggest that appellant is not now locked in Farview as a result of a criminal proceeding. Appellant was charged with and indicted for crimes. He was before the court which instituted competency proceedings as a direct result of those charges. Obviously competency to stand trial is not at issue unless there is contemplated a trial for which the accused may have to stand.

The fact of the crime and the type of crime is relevant to the way appellant may be handled once institutionalized. For example, one study of Farview indicates that "public fear and outrage" resulting from "atrocious acts" influences the hospital staff, perhaps creating "more stringent release standards to certain patients, in order to satisfy public vengeance. . . ." 110 U. Pa. L. Rev. 78, 94 (1961). Furthermore, the time which an individual spends in Farview will be thought of as "punishment" and frequently neither prosecuting authorities nor the public will press for further incarceration if the accused is released. *Id.* at 104.

The fact that appellant has been deprived of his liberty and incarcerated as a result of a competency hearing which is an adjunct of a criminal proceeding causes him to be treated differently than civil committees under the Commonwealth's mental health stat-

utes. Under prior law, civil committees were allowed to readjust to the outside world through prerelease trial visits, but this procedure was not available to the "criminally insane" at Farview. *Id.* at 86. Under the Mental Health and Mental Retardation Act of 1966 the distinction is even more striking. A person, like appellant here, who is charged with a crime, detained in a penal institution and then committed can receive outpatient care under "conditions as the court [to whom application for the treatment is made], may direct, including *the entry of bail.* . . ." Act of October 20, 1966, P. L. 96, §408, 50 P.S. §4408 (Emphasis added.) In contrast, under §4406, there is no provision for court imposed conditions or the imposition of bail where persons under civil commitment are concerned. To conclude that a hearing which results in a situation where an individual cannot receive certain mental treatment without posting bail is not a "criminal" proceeding is completely unrealistic.

It is perfectly clear that appellant is being sent to an institution that has the trappings of a prison. The time he spends there, his potential for release, and the possibility of further incarceration are all influenced by the widely held opinion that his tenure in the institution is at least to some extent "punishment." To receive outpatient care, he may have to post bail, a procedure unique to the criminal process. And he has been committed under a procedure *which applies only to those who are in the criminal process because they are charged with a crime.* I believe that appellant's competency hearing was indeed part of a "criminal proceeding" and as a result he was entitled to the constitutional protections and evidentiary rules established in *Miranda* and *Escobedo.*

Turning to appellant's next claim, while I am not prepared to go as far as Mr. Justice O'BRIEN, who be-

lieves that it is violative of due process to require an accused to choose between competency proceedings and a trial, I nonetheless do not believe that the Commonwealth may do what it has done in this case by imposing competency proceedings on appellant against his will. It must be remembered that this is not the usual case, where an accused himself raises his own incompetency, in an attempt to postpone or eliminate his trial. Here appellant has requested a trial, but the Commonwealth has forced the competency proceeding on him.

Certainly there is considerable substance in the fear that a prisoner may be greatly prejudiced by the trial delay engendered by his institutionalization. This danger is of course one of the main thrusts of the sixth amendment's speedy trial requirement. Furthermore, the accused must live under the threat of the indictment that continues to hang over him. As justification for this, the Commonwealth argues in effect that the competency proceeding is in appellant's own best interests.

This claim, I believe, misses the point of the competency hearing. In practically all cases, a competency hearing will be used to test the validity of an accused's claim that he should not stand trial. It is a sanity hearing, and cannot completely answer the question of the extent to which an accused is capable of proceeding with his case. ". . . [A] claim of trial incapacity brings into question the ability of the accused to consult effectively with his lawyer and to supply him with information relevant to the matter charged and his involvement, if any, in it. Dusky v. United States, 1960, 362 U.S. 402." *United States ex rel. Roberts v. Yeager,* 402 F. 2d 918, 919 (1968).

Here however the determination that appellant *could* stand trial has been made by his own attorney

who has spent considerable time with appellant preparing a case. I agree with Mr. Justice O'BRIEN's conclusion that whatever infirmity from which a defendant may suffer does not also affect his counsel, and that where there is a competency question, the court can always appoint an amicus counsel to protect a defendant who refuses an attorney. I would much prefer that an accused be protected by the opinion of his own attorney, or one appointed to protect him, than by the rather surprising solicitude of the prosecution in this case. Allowing the prosecution to raise appellant's competency to deprive appellant of his right to an immediate trial places the Commonwealth in the position of being an advocate, opposed to appellant, who can affect appellant's trial position by masquerading as appellant's benefactor.

The prosecution's actions here raise, in my opinion, a general due process problem, in addition to the speedy trial violation. The prosecution has taken a position contrary to the position it would normally be expected to take. Having charged appellant with a crime, it is now in effect telling him how to conduct his defense while continuing to act as advocate for the Commonwealth. Once appellant has been charged with a crime, it is no longer the Commonwealth's concern how he conducts his trial, cf. *State v. Obstein*, supra; it is grossly unfair for the Commonwealth to skewer appellant on the point of one of his own potentially available defenses, and in my view this cannot be permitted under our theories of due process.

It is no answer that appellant may be dangerous to society should he be acquitted and not institutionalized. There is still ample opportunity to have appellant civilly committed. See 50 P.S. §4406 (commitment proceeding can be brought by "any responsible person," as well as by certain government agencies).

Under those circumstances he would not be committed subject to the criminal commitment limitations and restrictions discussed earlier. This is exactly to what appellant should be entitled if he goes to trial and is not convicted. (If appellant is acquitted by reason of insanity, the new Mental Health Act dictates that this commitment, if any, be under the civil commitment procedures of §4406, 50 P.S. §4413.) I do not believe that an accused should be stigmatized as a criminal and subjected to procedures for treating the criminally insane when he, on advice of *his own* counsel, would be willing to proceed to trial despite any infirmity from which he may be suffering. It is not for the Commonwealth to interfere with his desires as to the conduct of his legal affairs.

Accordingly I dissent from the majority's determination. Since I believe that the competency hearing was impermissible when appellant wished to go to trial, I would vacate and remand for a trial on the merits of the alleged offenses. And even were the competency hearing permissible under these circumstances, I believe that its determination here was invalid if it utilized evidence in violation of *Miranda* and *Escobedo*.